GILMAN, J., delivered the opinion of the court in which COOK, J., joined. ■ MOORE, J. (pp. 490-94), delivered a separate dissenting opinion.
OPINION
RONALD LEE GILMAN, Circuit Judge.
Gary Roell, who suffered from chronic mental illness, caused a disturbance at his neighbor’s condominium while experiencing a condition known as excited delirium. Hamilton County sheriffs deputies arrived to find Roell half-naked, muttering unintelligibly, and standing next to a broken window holding a hose and the remnants of a hanging plant. While attempting to subdue Roell,' the deputies physically struggled with him and unsuccessfully tased him multiple times. Roell stopped breathing during the encounter with the deputies and was pronounced dead shortly thereafter. His death was documented by the coroner as natural, resulting from his excited delirium.
Roell’s wife, Nancy Roell,, appeals the district court’s grant of summary judgment in favor of the individual deputies on her claim under 42 U.S.C. § 1983. She also appeals the grant of summary judgment in favor of Hamilton County on her claims under both § 1983 and the Americans with Disabilities Act (the ADA). For the following reasons, wp AFFIRM the judgment of the district court.
I. BACKGROUND
A, Factual background
Roell suffered from mental illness, including schizoaffective disorder and paranoid delusions, for many years. Although Roell’s symptoms could be successfully controlled by medication, he had a history of noncompliance with his drug regimen. When he did not take his medication, Roell’s mental health deteriorated and his unpredictable behavior rendered him a danger to both himself and to others.
Roell stopped taking his medication in June 2013 and began exhibiting signs of mental decompensation by early August. Sometime, in the late evening hours of August 12 or the early morning hours of August 13, Roell entered a state-of excited delirium. Nancy Roell was out of town during this time, participating in a church mission in New Jersey. In the midst of his excited delirium, Roell damaged his and Nancy’s condominium by scattering debris, clothes; and other household items inside and around the building. Roell then went to the condominium of his neighbor, Ra-chana Agarwal, and threw -a flower pot through her window.
Agarwal was awakened by the noise of shattering glass and went downstairs to find Roell 'standing outside of her condominium by the broken window. She attempted to talk to Roell, who was screaming something about “water.” Roell then pulled the screen from Agarwal’s window and threw it at her. At that point, Agarwal became scared and ran back inside the condominium, where she told her son, So-ham, to call 911. Soham dialed 911 and handed the phone to Agarwal, who told the operator that her neighbor was “acting crazy.” Agarwal testified that, during this time, Roell appeared to be angry, his face red and his eyes bulging, .and he kept muttering unintelligible things about water. Roell was also pacing back and forth in front of Agarwal’s broken window, periodically peering into her condominium.
*477 Deputies Matthew Alexander, Willy Dal-id, and Joseph Huddleston responded'to the dispatch of a “neighbor trouble” call. First to arrive at Agarwal’s condominium were Deputies Alexander and Huddleston, who were told by Agarwal that Roell was “in the back breaking things.” They entered the gated patio area and saw Roell standing by Agarwal’s .broken window holding a garden hose with a metal nozzle in one hand and a garden basket in the other. The garden basket was a hanging plant surrounded by peat moss , and held together with plastic wire. Roell was wearing a t-shirt but was otherwise naked. According to Deputy Alexander, Roell was screaming “no” and something about water when he and Deputy Huddleston arrived.
Deputy Huddleston proceeded to ask Roell what he was doing. Although Deputy Huddleston could not recall Roell’s response, he testified that Roell immediately turned and approached him and Deputy Alexander in an aggressive manner. Roell still had the hose and the garden basket in his hands. Deputy Alexander similarly recalled that he and Deputy.Huddleston told’ Roell to “show us your hands” and that Roell, “immediately, within seconds,” charged at them at.a “pretty brisk walk.” Deputy Alexander also said that Roell approached them still holding the hose and the garden basket.
Soham Agarwal was watching the events unfold from inside the condominium and heard Roell screaming about how “he didn’t have water and we had water.” In addition, Soham observed the deputies telling Roell to calm down, to stop resisting, to come over to them, and to drop whatever he 'had in his hands. Soham recalled that Roell repeatedly shouted that he did not have a weapon. But Soham also testified that, despite Roell’s assertions that he was unarmed, Roell was facing the deputies swinging the hose “as if he was trying to hit somebody.” Rachana Agarwal, also watching from the inside of her condominium, confirmed that the deputies told Roell to calm down and that Roell was swinging the hose nozzle at the deputies. Agarwal observed the deputies and Roell approach each other, with Roell proceeding at a pace between a walk and a sprint, still holding the hose.
As Roell approached the deputies, Deputy Huddleston told Roell to stop and to get on the ground or he would be tased. Deputy Huddleston then unholstered his X2 Taser and. arced it as a warning. Arcing a taser does not deploy the device; it simply creates a sound. Roell flinched when Deputy Huddleston arced his taser but kept approaching. Deputy Huddleston once more arced his taser and commanded Roell to get on the ground-. Roell again flinched but continued to approach the deputies. Deputy Huddleston then holstered his taser and reached out to grab one of Roell’s arms. At the same time, Deputy Alexander grabbed Roell’s other arm.
Roell swung the garden-basket at Deputy Huddleston, as they met. Deputy Hud-dleston, Deputy Alexander, and Roell all fell to the ground outside of the gated patio area during their struggle. Roell was wét and slippery, either from sweat or water, and managed to break free from the deputies’ grasp. As Roell tried to enter back through the patio gate, Deputy Hud-dleston- tased him. Deputy Huddleston testified that taser appeared to have some effect because Roell buckled over a little bit. Roell nonetheless continued into the patio and closed the gate. The deputies followed him through the gate while Deputy Huddleston’s taser was- still on its five-second deployment cycle. By that time, Deputy Dalid had arrived at the scene. All three deputies tried to restrain Roell’s arms, but- were unsuccessful because he *478 was combative and thrashing around on the ground. Deputy Alexander testified that he was punched in the face by Roell at some point during the struggle.
While Deputies Alexander and Dalid attempted to hold Roell’s arms, Deputy Hud-dleston 'tried to deploy his taser' in drive-stun mode to the back of Roell’s leg. This court has previously explained the use of a taser in drive-stun mode as follows:
In drive-stun mode, ‘the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock ...[,] but does not cause an override of the victim’s central nervous system as it does in dart-mode.’
Cockrell v. City of Cincinnati, 468 Fed.Appx. 491, 492 (6th Cir. 2012) (quoting Mattos v. Agarano, 661 F.3d 433, 443 (9th Cir. 2011) (en banc)). In deploying his ta-ser in drive-stun mode, Deputy Huddle-ston hoped to complete the cycle necessary to achieve Roell’s neuromuscular incapacitation, believing that one of the barbs from his previous attempt to tase Roell had not connected. The taser failed to incapacitate Roell, however, and he continued to struggle with the deputies on the ground. Deputy Huddleston again holstered his taser and tried to control Roell’s legs, while Deputies Alexander and Dalid attempted to control Roell’s arms.
Roell managed to escape the grasp of all three deputies and stood up in a face-to-face position with Deputy Alexander, whose back was against a tree. Deputy Huddleston once more tased Roell using the device’s dart-mode, this time deploying two barbs into his back. Although the taser still did not take effect, the deputies were able to get Roell on the ground and handcuff him. Because of Roell’s continued resistance, the deputies had to restrain Roell’s hands in front of his body by using two sets of handcuffs.
Roell appeared “somewhat under control” once he was handcuffed, but he continued to thrash his legs and kicked Deputy Huddleston in the groin. Deputy Huddleston then sent Deputy Alexander to get leg shackles from the one of the patrol cars so that Roell’s feet could also be restrained. Once the deputies shackled Roell’s legs, they positioned him on his left side. Deputy Dalid was trying to control Roell’s upper body by holding on to his right shoulder. Both Deputy Huddle-ston and Deputy Dalid testified that, once restrained, Roell went limp and began to snore. Roell would wake up, thrash around, and then go limp and lapse back into snoring. Deputy Dalid observed Roell doing this twice before he noticed that Roell had no pulse and had stopped breathing. By that time, Corporal (now Sergeant) Mikal Steers arrived on the scene and began administering CPR to Roell until the life squad arrived. Although Corporal Steers detected a faint pulse on several occasions, he was unable to revive Roell. The emergency medical technicians were also unable to revive Roell, and he was pronounced dead at the hospital emergency room.
Dr. Jennifer Schott, the deputy coroner, determined that the cause of Roell’s death was “excited delirium due to schizoaffec-tive disorder” and that the manner of his death was natural. Included with the Death Record was a report drafted by Dr. Schott, stating that Roell had a history of “physical altercation with police officers” and that the “use of a conducted energy device against decedent” had occurred. Also noted were Roell’s various abrasions and contusions, injuries from the taser barbs, and four broken ribs. The report, however, did not find that any of these injuries contributed to Roell’s death. In *479 her affidavit, Dr. Schott stated that she performed a microscopic examination of itoell’s barb wounds and found no evidence that the conducted energy device used on Roell caused any electrical burns. Nor did Dr. Schott find any evidence that Roell had been asphyxiated, which is consistent with the absence of any evidence that the deputies applied compressive force in attempting to restrain Roell.
B. Procedural background
In August 2014, Nancy Roell, as the executrix of Roell’s estate, filed suit in the United States District Court for the Southern District of Ohio against both Hamilton County and the Hamilton County Board of County Commissioners (collectively, Hamilton County), as well as against Sheriff Jim Neil and Deputies Alexander, Dalid, and Huddleston. She first asserted claims pursuant to 42 U.S.C § 1983, alleging that (1) Deputies Alexander, Dalid, and Hud-dleston violated Roell’s Fourth Amendment right to be free from excessive force, and (2) Hamilton County and Sheriff Neil are subject to municipal liability for the deputies’ alleged use of excessive force. Nancy Roell also brought intentional-discrimination and failure-to-accommodate claims against all of the defendants under Title II of the ADA. Finally, she asserted a state-law claim for the wrongful death of Roell against all of the defendants and a state-law claim for assault and battery against Deputies Alexander, Dalid, and Huddleston.
In February 2016, the defendants filed a “Motion to Dismiss and Motion for Summary Judgment” pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which the district court granted in part and denied the remainder as moot. First, the court held that Deputies Alexander, Dalid, and Huddleston were entitled to qualified immunity on Nancy Roell’s § 1983 claim, with the result that Sheriff Neil and Hamilton County were also not liable under § 1983. Roell v. Hamilton Cty. Bd. of Cty. Comm’rs, No. 1:14-CV-637, 2016 WL 4363112, at *14 (S.D. Ohio Aug. 16, 2016). The court next ruled that Nancy Roell had failed to establish a viable claim under the ADA because she did not produce any evidence that the defendants intentionally discriminated against Roell because of his disability. Id. Finally, the court held that Nancy Roell had abandoned her state-law claims against Hamilton County and Sheriff Neil. The court then declined to exercise supplemental jurisdiction over the remaining state-law claims asserted against the individual deputies and therefore denied as moot the defendants’ motion to dismiss and/or for summary judgment as to those claims. Id.
In rendering its decision, however, the district court did not specify whether it resolved the defendants’ motion using the summary-judgment standard or the motion-to-dismiss standard. Id. But the content of the defendants’ motion, the extensive discovery period, and the court’s consideration of materials outside of the pleadings indicate that the case was decided on summary-judgment grounds. In any event, Nancy Roell appeals only the district court’s grants of summary judgment in favor of (1) Deputies Alexander, Dalid, and Huddleston on her § 1983 claim, and (2) Hamilton County on her § 1983 and her ADA claims.
II, ANALYSIS
A. Standard of review
We review de novo a district court’s grant of summary judgment. Watson v. Cartee, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. *480 P. 56(a). A genuine dispute of material fact exists “if the evidence is such that a reasonable jury could return a verdict for the nohmoving party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden to “demonstrate the absence of a genuine [dispute] of material fact.” Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Finally, “[i]n making this assessment, we must view all evidence in the light'most favorable to the nonmoving-party.” Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 301 (6th Cir. 2016).
B. Nancy ■ Roell’s § 1983 claim against Deputies Alexander, Dalid, and • Huddleston
Nancy Roell claims that Deputies Alexander, Dalid, and Huddleston violated Roell’s Fourth Amendment rights when, they used excessive force to subdue him. The deputies pled the affirmative defense of qualified immunity, which “protects government officials ‘from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable-person would have known.’ ” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Nancy Roell bears the “ultimate burden of proof’ to show that the deputies are not entitled to qualified immunity. See Sheets v. Mullins, 287 F.3d 581, 586 (6th Cir. 2002).
“We ask two questions in evaluating whether a law-enforcement officer is entitled to qualified immunity on an excessive-force claim: ‘(1) whether the officer violated the plaintiffs constitutional rights under the Fourth Amendment; and (2) whether • that constitutional right was clearly established at the time of the inci-. dent.’ ” Estate of Hill v. Miracle, 853 F.3d 306, 312 (6th Cir. 2017) (quoting Kent v. Oakland County, 810 F.3d 384, 390 (6th Cir. 2016)). These questions can be answered in any order. Pearson, 555 U.S. at 236, 129 S.Ct. 808. In holding that the deputies were entitled to qualified immunity, the district court answered both questions in the negative.- The court concluded that the deputies did -not violate Roell’s Fourth Amendment rights and that, even if they did, no caselaw clearly established that the degree of force used by the deputies violated such rights. We -will address each of these conclusions in turn.
1. The deputies. likely did not violate Roell’s Fourth Amendment rights.
The Fourth Amendment “guarantees citizens the right ‘to be secure in their persons ... against unreasonable ... seizures’ of the person.” Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In determining whether an officer has used excessive force -in violation of the Fourth Amendment, “we employ an objective-reasonableness test,, asking ‘whether the officers’ actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.’ ” Hill, 853 F.3d at 312 (quoting Graham, 490 U.S. at 397, 109 S.Ct. 1865). This test “requires a careful balancing of ‘the nature and quality of the intrusion on the individual’s. Fourth Amendment interests’ against the countervailing governmental interests at stake.” Graham, 490 U.S. at 396, 109 S.Ct. 1865 (quoting Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).
The Supreme Court has articulated three factors for us to consider in determining the objective reasonableness of. a particular use of force. These factors are (1) “the severity of the crime at issue,” *481 (2) “whether the suspect poses an immediate threat to the safety of the officers or others,” and (3) “whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. In evaluating these' factors, we must keep in mind that “[t]he ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Id. Finally, although the Graham factors are instructive, they “are not an exhaustive list, as the ultimate inquiry is ‘whether the totality of the' circumstances justifies a particular sort of seizure.’ ” Livermore ex rel. Rohm v. Lubelan, 476 F.3d 397, 404 (6th Cir. 2007) (quoting St. John v. Hickey, 411 F.3d 762, 771 (6th Cir. 2005)).
The first Graham factor—“the severity of the crime at issue”—supports a finding that some degree of force was justified in order to restrain and arrest Roell. Deputies Alexander, Dalid, and Huddle-ston responded to a “neighbor trouble” call and were quickly informed by a frightened Agarwal that Roell was “breaking things” in her backyard. They found Roell half-naked, muttering unintelligibly, and standing next to a broken window, which they reasonably inferred was shattered as a result of Roell’s actions. In other words; Roell had.committed a series of property crimes that a reasonable officer could infer might escalate. The fact that Roell had not yet committed a more serious felony did not preclude the deputies from using force to restrain him. See Cockrell v. City of Cincinnati, 468 Fed.Appx. 491, 495 (6th Cir. 2012) (recognizing numerous cases holding that an officer’s use of a taser against a plaintiff who is “actively resisting arrest by physically struggling with, threatening, or disobeying officers” is not a violation of the plaintiffs clearly established Fourth Amendment rights, even if the plaintiff is suspected of committing only a'misdemeanor).
Application of the second Graham factor—whether Roell posed an immediate threat to the deputies or. to others—also indicates that the deputies’ use of force was warranted. When the'deputies first encountered Roell, he was holding objects that, could have been used as weapons amid a scene of property destruction. See In re Fortney, 162 Ohio App.3d 170, 832 N.E.2d 1257, 1268-69 (2005) (noting that Ohio law “defines a .deadly weapon as ‘any instrument, device, or thing capable of inflicting death, and designed or specially adaptable for,use as a weapon, or possessed, carried, or used as a weapon’ ” and recognizing that a stick, when used as a club, can constitute a deadly weapon). .The deputies-therefore had-a reasonable basis to believe that Roell presented an immediate .threat to the Agarwals and to the deputies themselves “in light of the facts and circumstances confronting” them. See Graham, 490 U.S. at 397, 109 S.Ct. 1865.
First, Roéll posed a potential threat to the Agarwals, who were still inside the condominium. Because Roell had already thrown a potted plant through the Agar-wál’s condominium window, the deputies were reasonably concerned that he might break into their residence and cause further destruction.’ Roell also posed an immediate threat to the deputies themselves. Rahana Agarwal, Soham Agarwal, Deputy Alexander, and Deputy Huddleston all testified that Roell quickly approached the deputies while waving the metal nozzle of a hose in a , threatening • manner. Deputy Huddleston testified that the hose and the metal nozzle could have been used as a weapon to hit or to choke him.
Although Soham Agarwal heard Roell say- that he had no weapon and heard the deputies tell Roell to come over to them, these observations do not create a genuine *482 dispute of material fact as to whether Roell approached the deputies in a manner that posed an immediate threat to their safety. Even if Roell asserted that he was unarmed and moved towards the deputies in response to their commands, the undisputed evidence regarding the aggressive nature of his approach remains unchanged.
Finally, we turn to the third Graham factor and analyze whether Roell was actively resisting arrest. Undisputed record evidence shows that Roell resisted the deputies’ attempts to restrain and handcuff him by kicking, flailing, and wriggling away from their grasp. Nancy Roell responds that the deputies “foreseeably caused any resistance or escalated the encounter by failing to use verbal and tactical de-escalation.” But even if we assume that the deputies escalated the encounter with Roell—an assertion that we find dubious—law-enforcement officers cannot be held liable solely because they created the circumstances requiring the application of force. See Livermore ex rel. Rohm v. Lubelan, 476 F.3d 397, 406 (6th Cir. 2007) (rejecting the notion that a “Fourth Amendment claim against police officers who used deadly force may survive summary judgment, even where the particular seizure is reasonable, if the defendant police officers acted recklessly in creating the circumstances which required the use of deadly force”). Analysis of the third Graham factor therefore supports our conclusion that the deputies were justified in using some degree of force in attempting to restrain Roell.
Our analysis of the Graham factors, however, is not the end of the excessive-force inquiry. We must also assess whether the “totality of the circumstances justified” the “particular sort of ... seizure” imposed upon Roell. See Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The totality of the circumstances includes “the fact that at the time of the ... struggle, the defendant officers had reason to believe that [Roell] was either on drugs or mentally unstable.” See Landis v. Baker, 297 Fed.Appx. 453, 465 (6th Cir. 2008). Although the officers were unaware that Roell was experiencing an episode of excited delirium, Deputy Huddleston testified that Roell’s behavior indicated that he was suffering from some sort of mental illness.
The deputies were therefore required to take into account Roell’s diminished capacity before using force to restrain him. See Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir. 2004) (“The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.”). But no caselaw supports Nancy Roell’s assertion the deputies were prohibited from using any physical force against Roell before first attempting alternative de-escalation techniques. See Cook v. Bastin, 590 Fed.Appx. 523, 530 (6th Cir. 2014) (holding that no excessive force was used in handcuffing and physically restraining a man suffering from excited delirium who posed a threat to the law-enforcement officers and who was resisting arrest). In sum, we agree with the district court’s observation that “the fact that Roell’s resistance was probably caused by his excited delirium did not preclude the deputies from using a reasonable amount of force to bring him under control.” Roell, 2016 WL 4363112, at *8.
Despite Roell’s apparent diminished capacity, he had committed a series of property crimes, was a threat to the Agar-wals and to the deputies, and was actively resisting arrest. “[A] reasonable officer on the scene” could have concluded the use of force was necessary based on the totality of these circumstances. See Graham, 490 *483 U.S. at 396, 109 S.Ct. 1865. “[T]he question is not whether any force was justified” but, instead, whether the deputies “could reasonably use the degree of force employed against” Roell. See Martin v. City of Broadview Heights, 712 F.3d 951, 958 (6th Cir. 2013) (emphasis in original). The type of force employed by the deputies against Roell—physically restraining his limbs, wrestling with him, attempting to tase him, and shackling his arms and legs—was likely not excessive. But we need not definitively answer this question because, at the time of the alleged violation, no caselaw clearly established that the degree of force used by the deputies violated Roell’s Fourth Amendment rights.

2. The constitutional right alleged by Roell was not clearly established.

“In order for a right to be clearly established for the purposes of qualified immunity, ‘[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.’ ” Estate of Hill v. Miracle, 853 F.3d 306, 316 (6th Cir. 2017) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). “The relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that. his conduct was unlawful in the situation he confronted.” Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). We must therefore determine whether a right was clearly established “in light of the specific context of the ease, not as a broad general proposition.” Id. at 201, 121 S.Ct. 2151.
Requiring this “particularized” showing “is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.” Anderson, 483 U.S. at 640, 107 S.Ct. 3034 (internal citations omitted). The content of this pre-existing law is determined by looking “first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.” Champion, 380 F.3d at 902 (quoting Higgason v. Stephens, 288 F.3d 868, 876 (6th Cir. 2002)). “An action’s unlawfulness may be plain ‘from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs’ ” in these cases. Martin, 712 F.3d at 961 (quoting Champion, 380 F.3d at 902).
With these general principles in mind, we turn to the question at hand: whether Nancy Roell has demonstrated “the prior articulation of a prohibition against the type of excess force exerted” against Roell, sufficient to defeat the deputies’ affirmative defense of qualified immunity. See Champion, 380 F.3d at 902. We must determine, in other words, whether a reasonable officer would have known that the forcible physical restraint employed in this case against an individual who appeared mentally impaired, yet posed a potential threat to the officers and to others, violated that person’s Fourth Amendment rights.
Nancy Roell argues that Martin v. City of Broadview Heights, 712 F.3d 951 (6th Cir. 2013), demonstrates that the deputies violated Roell’s clearly established rights. The decedent in Martin broke into an apartment while naked and high on LSD. Id. at 954-55. Four police officers arrived on the scene to find Martin speaking quickly and nonsensically. Id. Martin calmed down momentarily to ask for help and to be arrested, but then “jogged away” *484 when the officers tried to handcuff him. Id. The'officers caught up with Martin and fell on top of him. In addition, they delivered “compliance body shots” to Martin’s side, struck him in the face with two “hammer punches,” kneeled on his calves, struck his face, back, and ribs at least five times, and held Martin in a face-down position. Id. at 954-55. Two of the officers heard Martin emit a “gurgling sound” during this struggle and, when they rolled him over, he was unresponsive. Id. at 955. Although the coroner determined that Martin died from an acute psychotic episode with excited delirium due to intoxication, a forensic pathologist who conducted Martin’s autopsy concluded that asphyxia was the likely cause of his death.
The Martin court held that “[a] reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person’s clearly established right to be free from excessive force.” Id. at 963. In doing so, the court observed that the officers were obligated to “de-escalate the situation and adjust the application of force downward” when confronted with an unarmed individual who “exhibited conspicuous signs that he was mentally unstable.” Id. at 962. We agree with the district court, however, that this statement must be viewed in the context of the officers’ applied use of force, which was characterized by the Martin court as “severe.” Id. at 958; see also Roell, 2016 WL 4363112 at *9 (“More reasonably, Martin stands for the proposition that officers should try to de-escalate the situation with a mentally disturbed suspect before resorting immediately to severe force to subdue him.”).
Unlike the officers in Martin, Deputies Alexander, Dalid, and Huddleston did not repeatedly beat Roell or apply compressive body pressure-to his back. They instead “grappled with Roell’s arms and legs to try to control him, which they eventually did.” Roell, 2016 WL 4363112 at *9. Deputy Huddleston did attempt to tase Roell, but no electricity was conducted into his body. And although this court has observed that use of a taser entails a higher level of force “than simply knocking someone back.to the ground,” Wells v. City of Dearborn Heights, 538 Fed.Appx. 631, 639 (6th Cir. 2013), a “growing national judicial consensus” exists that the use of a taser in dart mode constitutes only an intermediate use of force. Bryan v. MacPherson, 630 F.3d 805, 810 (9th Cir. 2010) (Wardlaw, J., concurring). Martin, moreover, was “unarmed and minimally dangerous,” whereas Roell was threateningly waving a hose with a metal nozzle that could be used as a weapon.
Because of these factual differences, Martin did not put the deputies on notice that their actions violated’ Roell’s clearly established right to be free from excessive force. Nor do the other cases cited by Nancy Roell, which hold that police use excessive force when they deploy gratuitous force or a taser against an individual who is already restrained or is doing nothing to resist arrest, provide such notice. See, e.g., Eldridge v. City of Warren, 533 Fed.Appx. 529, 535 (6th Cir. 2013) (holding that the police used excessive force when they tased an individual who was suffering from a hypoglycemic episode and whose “noncompliance was not paired with any signs of verbal hostility or physical resistance”); Landis v. Baker, 297 Fed.Appx. 453, 461, 464 (6th Cir. 2008) (holding that the police used excessive force against an individual suffering from a mental health crisis who “was not actively resisting arrest or posing a threat to anyone” when they struck him ten -times with a baton, held -him face down into two feet of mud *485 and water and repeatedly tased him); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004) (holding that the police used excessive force against a severely autistic man who “stopped resisting arrest and posed no flight risk” when they “sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device”). But see Rudlaff v. Gillispie, 791 F.3d 638, 641 (6th Cir. 2015) (collecting cases and concluding that “[o]ur cases firmly establish that it is not excessive force for the police to tase someone (even multiple times) when the. person is actively resisting arrest.” (emphasis in original)).
We believe that this case is instead more analogous to Cook v. Bastin, 590 Fed.Appx. 523 (6th Cir. 2014). In that case, a severely autistic man became agitated, stripped naked, caused extensive property damage to his room in an adult daycare center, and ripped the shirt of the daycare center’s Crisis Manager. Id. at 525. The police arrived to find the man, Roland Campbell, digging- his lacerated fingers into an electrical socket. They observed the Crisis Manager’s torn and bloody shirt, which they interpreted as an indication that physical violence had occurred. The officers were told that Campbell was out-of-control, suffered from mental disabilities, and needed to- be taken to a mental facility.
Campbell was handcuffed without incident and placed in a sitting position; While the- police waited for the medical transport unit, however, Campbell “began thrashing and kicking, making grunting sounds as he tried to free himself from thé-handcuffs,” rolled onto • a prone position, and began scooting on his stomach towards the doorway. Id. at 526. The officers attempted to gain control of Campbell by restraining his arms and legs, while the Crisis Manager held his torso. During the struggle, Campbell pulled the men into the hallway, freed one of his hands from the cuffs, and “pick[ed] himself and everybody up.off the ground with the one hand about three or four inches.” Id. Campbell then collapsed, fell unconscious, and died as a result of acute cardiorespiratory failure. The Cook court held that the degree of force used by the officers was reasonable because Campbell had committed significant property destruction and a physical assault, posed an immediate threat to himself, the officers, and to others, and attempted to free himself from the officers’ restraint. Id. at 530-31.
Like Campbell, Roell caused significant property damage, was a threat to the officers and to others, and resisted arrest during an episode of excited delirium. Although Deputies Alexander, Dalid and Huddleston did not observe any “signs of physical violence,” they did observe that Roell was holding objects that could be used as weapons. True enough, the deputies’ wrestled with and attempted to tase Roell, arguably deploying a higher level of force than the officers in Campbell. But this court has previously held that an officer’s “single use of the taser in drive-stun mode” against a mentally unstable plaintiff who was a threat to officer safety and his own safety, and who was resisting police attempts to transport him to the hospital, did not constitute excessive force. See Caie v. West Bloomfield Township, 485 Fed.Appx. 92, 94-96 (6th Cir. 2012). And there is no question -that the degree of force employed by Deputies Alexander, Dalid, and Huddleston was far less than the unconstitutionally severe force used by the officers in Martin. In sum, the relevant caselaw does not clearly establish -that the deputies violated Roell’s Fourth Amendment rights because their actions fell in the “hazy border between excessive and acceptable force.” See Brosseau v. Haugen, 543 U.S. 194, 201, 125 S.Ct. 596, 160 *486 L.Ed.2d 583 (2004) (quoting Saucier, 533 U.S. at 206, 121 S.Ct. 2151).
Finally, Nancy Roell relies on the procedures articulated in the training materials. of the Ohio Peace Officer Training Commission (OPTC) and in proffered expert testimony in an effort to prove that Roell’s right to be free from excessive force was clearly established. She first argues that the deputies did not follow the OPTC procedures when they neglected to recognize that Roell was exhibiting the common symptoms of excited delirium, proceeded to engage Roell before staging the scene with multiple officers and medical personnel, and failed to use verbal de-escalation techniques before attempting to physically restrain him. Nancy Roell also points to the expert testimony of Dr. Michael Lyman, who stated that de-escalation was the “standard technique” recommended for crime-related encounters with excited-delirium subjects and who opined that, had the deputies used verbal de-escalation, Roell would have likely been talked into surrendering without an altercation. Based on this evidence, Nancy Roell argues that the deputies had a “clearly established duty” to use de-escalation techniques prior to using force against Roell.
In considering her argument, we must “evaluate the officers’ use of certain tactics ‘in light of testimony regarding the training that [the officers] received.’ ” Martin, 712 F.3d at 960 (quoting Griffith v. Coburn, 473 F.3d 650, 657 (6th Cir. 2007)). But we also must judge the reasonableness of a particular use of force “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. A finding of qualified immunity is therefore not precluded simply because the deputies acted contrary to their training. City of San Francisco v. Sheehan, — U.S. —, 135 S.Ct. 1765, 1777, 191 L.Ed.2d 856 (2015) (“Even if an officer acts contrary to her training, however, ... that does not itself negate qualified immunity where it would otherwise be warranted.”). In addition, although the deputies did not follow every OPTC protocol, we note that the training materials acknowledge that the use of a taser might be effective in controlling an individual suffering from excited delirium, that a physical struggle might ensue, and that force might be appropriate or necessary in order to restrain the individual.
Dr. Lyman’s expert testimony, which essentially opines on the best approach that the deputies could have taken in ideal circumstances, similarly does not establish that the deputies violated Roell’s clearly established rights. As an initial matter, “[t]he Fourth Amendment ... does not require police officers to take the better approaeh[,] ... only that they take a reasonable approach.” Cook v. Bastin, 590 Fed.Appx. 523, 528 (6th Cir. 2014). And “so long as ‘a reasonable officer could have believed that his conduct was justified,’ a plaintiff cannot ‘avoi[d] summary judgment by simply producing an expert’s report that an officer’s conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.’ ” Sheehan, 135 S.Ct. at 1777 (quoting Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002)).
In sum, Nancy Roell points to no case-law clearly establishing that the deputies violated Roell’s Fourth Amendment rights in effectuating his arrest. Even assuming that law-enforcement officers must “adjust the application of force downward” when confronted with a conspicuously mentally unstable arrestee, Martin, 712 F.3d at 962, no precedent establishes that the level of force used by the deputies in this case was excessive or that the deputies were required to use only verbal de-escalation *487 techniques. The content of the OPTC training material and Nancy Roell’s proffered expert testimony do not change our conclusion. Deputies Alexander, Dalid, and Huddleston are therefore entitled to qualified immunity, meaning that the district court did not err in granting summary judgment to the them on Nancy Roell’s § 1983 claim.
C. Nancy Roell’s § 1983 claim against Hamilton County
Nancy Roell also challenges the district court’s grant of summary judgment in favor of Hamilton County on her claim for municipal liability under § 1983. She put forth three theories as to why Hamilton County is subject to municipal liability: (1) Hamilton County’s policy and custom for handling mentally-ill individuals was the driving force behind the deputies’ use of excessive force, (2) Hamilton County failed to adequately train the deputies, and (3) Hamilton County ratified the .deputies’ use of excessive force.
We recognize that “[a] municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.” Blackmore v. Kalamazoo County, 390 F.3d 890, 900 (6th Cir. 2004). The district court held that Deputies Alexander, Dalid, and Huddleston did not violate Roell’s Fourth Amendment rights under the first prong of the qualified-immunity analysis. It therefore granted summary judgment in favor of Hamilton County based on that ground and did not address any of Nancy Roell’s theories for municipal liability.
We, on the other hand, have utilized the second prong of the qualified-immunity analysis to conclude that the deputies are entitled to summary judgment because no caselaw clearly established that the degree of force used by the deputies violated Roell’s Fourth Amendment rights. In doing so, we have reached no conclusion with respect to whether Roell’s rights were actually violated. We must therefore address Nancy Roell’s three theories for Hamilton County’s liability by assuming, without deciding, that Roell’s Fourth Amendment rights were violated by the deputies’ excessive use of force.
Hamilton County is subject to liability under § 1983 for its policy on handling’mentally ill individuals only if Nancy Roell can “demonstrate ‘a direct causal link between the policy and the alleged constitutional violation.’” See Brown v. Chapman, 814 F.3d 447, 463 (6th Cir. 2016) (quoting Graham ex rel. Estate of Graham v. County of Washtenaw, 358 F.3d 377, 383 (6th Cir. 2004)). But Nancy Roell does riot point to any policy that is the “moving force” behind the deputies’ actions. See id. She instead argues that Hamilton County’s lack of adequate policies and training caused the deputies’ use of excessive force. '
Inadequate training can serve as the basis for municipal liability under § 1983 where it “amounts to deliberate indifference to the rights of persons with whom the police come into contact.” City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To succeed on this claim, Nancy Roell “must show ‘(1) that a training program is made-, quate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [County’s] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiffs injury.’” Brown, 814 F.3d at 463 (quoting Plinton v. County of Summit, 540 F.3d 459, 464 (6th Cir. 2008)). Nancy Roell cannot meet the first prong of this test, however, because Hamilton County had a satisfactory training program in place regarding officer interactions with *488 individuals suffering from mental illness and excited delirium.
The record shows that the deputies 'received training on topics that included the use of force and tasers, crisis intervention techniques, interacting with the special-needs population and mentally ill suspects, and recognizing the symptoms of excited delirium. Finally, we note that Nancy Roell’s argument that Hamilton County failed to train its deputies is completely inconsistent with her § 1983 claim that the deputies’ use of excessive force was evidenced by the fact that they failed to follow Hamilton County’s procedures regarding officer interactions with individuals suffering from excited delirium.
This leaves Nancy Roell with her argument that Hamilton County ratified the use of excessive force by Deputies Alexander, Dalid, and Huddleston when it conducted an inadequate investigation .of the events. Specifically, she asserts that the investigation merely rubber-stamped the deputies’ unconstitutional conduct, neglected to discover what actually took place, and failed to review whether the deputies’ actions violated Hamilton County’s policies and procedures. Once again, however, the record demonstrates otherwise.
The internal investigation included interviews of multiple witnesses, detailed fact-finding, and incorporates additional investigations by the Criminal Investigations Unit of the Sheriff’s Office and the Hamilton County Coroner. In addition, Nancy Roell’s own expert, Dr. Lyman, testified that he could not think of ’any additional interviews that should' have been conducted during the investigation, could not point' to any physical evidence that was not preserved-or test results that were not considered, and could not identify any specific inadequacies in the collection of testimonial or tangible evidence. We therefore disagree with Nancy Roell’s argument that “no serious investigation” occurred regarding the deputies’ use of force. See Marchese v. Lucas, 758 F.2d 181, 188 (6th Cir. 1985). Because Hamilton County is not subject to municipal liability under any of her theories, the district court did not err in granting summary judgment to the county on her § 1983 claim.
D. Nancy Roell’s ADA claim against Hamilton County
Finally, Nancy Roell appeals the district court’s grant of summary judgment in favor of Hamilton County based on her claim under Title II of the ADA. Title II provides that “no qualified individual with a disability shall, by reason of such disability, be excluded from 'participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” 42 U.S.C. § 12132. Two types of claims are cognizable under Title II: claims for intentional discrimination and claims for. a reasonable accommodation. Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 907 (6th Cir. 2004).
The district' court dismissed Nancy Roell’s ADA claim because it found no evidence 'that the defendants intentionally discriminated against Roell based on his disability. In so holding, however, the court failed to consider Nancy Roell’s failure-to-accommodate theory. Under this theory, Nancy Roell asserted that Hamilton County had a duty to accommodate Roell’s disability by “having its officers take steps to calm the situation, converse with Mr. Roell in- a non-threatening manner, pause to gather information from -Ra-chana Agarwal, refrain from the application of force, and summon EMS to the scene at the earliest moment possible.”
*489 Neither the Supreme Court nor this circuit has squarely addressed whether Title II of the ADA applies in the context of an arrest. Nancy Roell urges us, however, to adopt the reasoning of several of oür sister circuits that have found Title II applicable to law-enforcement activities, including arrests.
A few opinions have indeed indicated that arrestees might be able to bring cognizable claims under Title II. But, in doing so, they have also noted that the exigent circumstances inherent in an arrest inform the reasonable-accommodation analysis. See, e.g., Sheehan v. City of San Francisco, 743 F.3d 1211, 1232 (9th Cir. 2014), rev’d in part, cert. dismissed in part, — U.S. —, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015) (holding that “the ADA ... applies to arrests, though we agree with the Eleventh and Fourth Circuits that exigent circumstances inform " the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment”); Bahl v. County of Ramsey, 695 F.3d 778, 784 (8th Cir. 2012) (noting that “[e]ven if the ADA applied to [a] traffic stop,” the defendant police officer was not required to accommodate the plaintiffs disability “under thé exigencies of the traffic stop”). But see Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000) (“Title II does not apply to an officer’s on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities,, prior to the. officer’s securing the scene and ensuring, that there is no threat to human life.”).
We need not decide whether Title II applies in the context of arrests because, even if Nancy Roell’s failure-to-accommodate claim is cognizable, Hamilton County is entitled to.summary judgment based on the facts of this case. This circuit has previously held that “the ‘determination of what, constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry.’ ” Anderson v. City of Blue Ash, 798 F.3d 338, 356 (6th Cir. 2015) (quoting Lentini v. Cal. Ctr. for the Arts, 370 F.3d 837, 844 (9th Cir. 2004)). Deputies Alexander, Dalid, and Huddleston unquestionably faced exigent circumstances while attempting to restrain and arrest Roell. As detailed above, they responded to an unsecured scene to find an individual who had committed, at the very least, a series of property crimes and who posed a continuing threat to the deputies and to others. In fact, almost immediately after, the deputies arrived, Roell swiftly, approached them brandishing a hose with a metal nozzle and a garden basket. .The deputies, in other words, were required to make a series of quick, on-the-spot judgments in a continuously evolving environment.
Nancy Roell’s proposed, accommodations—that the deputies use verbal deescalation techniques, gather information from the witnesses, and call EMS services before engaging with Roell—were therefore “unreasonable ... in light of the overriding public safety concerns.” See Tucker v. Tennessee, 539 F.3d 526, 536 (6th Cir. 2008), abrogated on other grounds by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015); cf. Hainze, 207 F.3d at 802 (recognizing that “[o]nce the area was secure and there was no threat to human safety, the ... Sheriffs deputies would have been under a duty to reasonably accommodate [plaintiffs] disability in handling and transporting him to a mental health facility”).
In the context of the exigent circumstances surrounding Roell’s arrest, Nancy Roell cannot make out a viable ADA claim under her failure-to-accommodate theory. Nor has she presented any evidence that Hamilton County .intentionally discriminated against Roell based on his disability. *490 The district court therefore did not err in granting summary judgment in favor of Hamilton County on Nancy Roell’s ADA claim.
III. CONCLUSION
For all of the reasons set forth above, we AFFIRM the judgment of the district court.