NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0287n.06

No. 20-2086

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| RALPH KELLER, | ) | **FILED** |
| | ) | Jun 14, 2021 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| CHIPPEWA COUNTY, MICHIGAN BOARD OF | ) | UNITED STATES DISTRICT |
| COMMISSIONERS; CHIPPEWA COUNTY, | ) | COURT FOR THE WESTERN |
| MICHIGAN SHERIFF'S DEPARTMENT, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

Before: CLAY, McKEAGUE, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. After Ralph Keller was arrested on an outstanding warrant, he was detained for three nights in the Chippewa County Jail, where officers took custody of his breathing inhalers and his prosthetic leg. Keller sued the Chippewa County Board of Commissioners and the Chippewa County Sheriff's Department, alleging disability discrimination under Title II of the Americans with Disabilities Act (ADA), *see* 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794(a). The district court awarded summary judgment to the defendants. We AFFIRM.

I.

Around 3:30 a.m. on January 16, 2016, Ralph Keller was booked into the Chippewa County Jail. He had been arrested on an outstanding warrant for a misdemeanor controlled-substance offense. During booking, officers made two confiscations that are central to Keller's suit.

First, they took custody of Keller's inhalers. Keller suffers from stage-four chronic obstructive pulmonary disease (COPD), which is the final and most severe stage. He uses three inhalers to manage his condition. The first, Proair, is a short-acting rescue inhaler. The other two, Symbicort and Tudorza, are long-acting.

According to the jail administrator, Lieutenant Paul Stanaway, the jail has a policy against allowing detainees to keep prescription medications in their cells due to the risk of overdose or sharing with other inmates. When told of this policy, Keller did not ask to keep the inhalers with him. He handed them over and informed the officers how often he takes them each day. However, because Keller did not have the original boxes with the prescription information, an officer contacted the jail's physician, Dr. Dood, to determine the appropriate dosage. Dr. Dood advised that Keller should be given Proair four times daily as needed, Symbicort twice per day, and Tudorza once per day. Keller expressed disagreement with the Tudorza recommendation. Keller maintains that he should have been given Tudorza twice per day because that is the dosage that his personal pulmonologist, Dr. Amarjeet Sethi, has chosen for him. For Dr. Sethi's part, he later testified that "once a day" is "normally standard" for Tudorza and that he did not have an issue with Dr. Dood's decision not to prescribe two doses per day.

Second, at the end of the booking process, officers told Keller to remove his prosthetic leg. Keller "told them that [he] need[s] [his] leg" but complied with the instructions to remove it. According to Lieutenant Stanaway, the jail confiscated the prosthesis because it "could be used as a weapon to harm others" and because Keller had a sore where it attached to his leg. The prosthesis was made of hard plastic and metal. Keller testified that it weighed "about 10 to 15 pounds." Stanaway represents that confiscating the leg was in accordance with the jail's "booking policies and procedures." The defendants also submitted an affidavit from an expert witness, who agreed

that this decision "was reasonably related to a legitimate detention objective of maintaining security within the facility." Keller says when he was detained at the same jail in 2010, he had been allowed to keep his prosthetic. The record is otherwise silent on the circumstances of Keller's 2010 incarceration.

After giving up his prosthesis, Keller asked the deputies, "How am I going to get around?" According to Keller, a deputy responded, "hop around or crawl." Despite this callous remark, Keller was not, in fact, always required to get around on his own. Keller acknowledges that officers placed him in a wheelchair to bring him to his holding cell after booking. Indeed, the record never suggests that Keller was required to move outside his cell without the use of a wheelchair. For example, Keller says that officers wheeled him to and from the jail's recreation area and transported him in a wheelchair to receive medical treatment.

Immediately after booking, officers brought Keller to a holding cell. Officers wheeled Keller to the cell's doorway. When Keller got out of the wheelchair, he "scooted along with [his] one leg" as he "[h]eld [himself] against the wall or something" until he arrived at a bench where he could sit. The cell was about twenty-by-twenty feet in size. It was equipped with a bench, toilet, sink, and telephone, as well as an intercom system, which allows inmates to contact corrections officers. Officers hand-delivered three meals per day to the cell, and Keller was able to eat them. Officers would bring meals to the door of the holding cell, and Keller's two young cellmates would carry the food to him. The jail also provided Keller with a cup so that he could have warm water from the sink, which helps with his COPD. Keller testified that he was able to use the toilet and the sink in the holding cell, but he had a "hard time" getting there. Without his prosthetic leg, he had to "shuffle[]" to the toilet, but nothing in the record reveals how far he had to go or whether he had access to any handrails for assistance.

On his second or third day in jail, Keller was moved to an "observation cell" to facilitate medical treatment and monitoring of his COPD. The observation cell was smaller than the previous holding cell. While he was in this new cell, officers handed Keller his meals directly. Keller also had access to an emergency call button that could be used whenever he needed assistance. Keller does not assert that the absence of his prosthetic leg caused him any difficulty in the new cell.

Jail records show—and Keller does not contest—that he received his inhaler treatments as prescribed by Dr. Dood. However, his COPD still caused him great difficulty breathing. When Keller was having trouble catching his breath, he was able to inform jail personnel, and he received treatment. On more than one occasion, officers administered Keller's rescue inhaler when he requested help via the intercom system or emergency button in his cell. When treatments did not produce the desired effect, officers contacted Dr. Dood, who would advise them on how to proceed. In response, Dood prescribed prednisone and nebulizer treatments; Keller agrees that the jail administered these treatments.

During one COPD flare-up, Keller asked officers to take him to the hospital, and the officers contacted Dr. Dood for guidance. Dood responded that Keller was only to be taken to the hospital if "he [was] turning blue" or his "temperature [was] low," neither of which occurred. Tests revealed that Keller's blood oxygen level was at 96 percent and that his temperature was 98.1 degrees. So, rather than taking Keller to the hospital, officers gave him another nebulizer treatment. After the treatment, Keller was "breathing normally" and "felt much better" according to the jail incident report. Keller admitted at his deposition that this treatment made him feel "[a] little better."

On Keller's fourth day in jail, he pleaded guilty to his outstanding charges. He was sentenced to time served and a $120 fine. The jail released Keller that morning and returned his inhalers and prosthetic leg. Keller indicated that he was going to call an ambulance to take him to the hospital, but one of the officers volunteered to drive him there. Keller accepted the offer. The deputy drove him to the hospital and accompanied him inside.

After his release from jail, Keller sued the Chippewa County Board of Commissioners (the County) and the Chippewa County Sheriff's Department, alleging disability discrimination in violation of both the ADA and Rehabilitation Act. Specifically, he alleged that the defendants discriminated against him "by removing his prosthetic leg" and "by not allowing [him] to retain the use of his breathing aid." He alleged that it was necessary for him "to have the use of his prosthetic leg and inhaler for him to effectively obtain his meals, comply with orders, have his meals, maintain hygiene and otherwise have full access to the Chippewa County Jail facilities and services."

After discovery, the County and the Sheriff's Department moved for summary judgment. The district court dismissed Keller's claims against the Sheriff's Department on the ground that the department is one-and-the-same with the county government and is not a separate entity capable of being sued—a decision that Keller does not contest. The district court then granted summary judgment to the County on the merits of Keller's ADA and Rehabilitation Act claims. Keller timely appeals.

## II.

We review the district court's grant of summary judgment de novo. *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law" based on specific facts in the record.  Fed. R. Civ. P. 56(a), (c); *see Cincinnati Bell Tel. Co. v. Allnet Commc'n Servs. Inc.*, 17 F.3d 921, 923–24 (6th Cir. 1994).  The nonmoving party must show that the record contains sufficient evidence for a reasonable jury to rule in his favor on each "element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  We view the record and draw all reasonable inferences in the manner most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

III.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[1] 42 U.S.C. § 12132.  We recognize two types of claims under Title II of the ADA:  (1) failure-to-accommodate claims and (2) intentional-discrimination claims.  *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017) (citing *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004)).  A failure-to-accommodate claim asserts that the defendant "could have reasonably accommodated [the plaintiff's] disability, but refused to do so."  *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 460 (6th Cir. 1997) (en banc).  An intentional-discrimination claim asserts that the plaintiff's "disabilities were actually considered by the [defendant] in formulating or implementing" the harmful policies or conduct.  *Id.*

---

[1] The ADA defines "public entit[ies]" to include "any State or local government" or "any department, agency, . . . or other instrumentality of a State or . . . local government."  42 U.S.C. § 12131(1).  The parties do not dispute that the Chippewa County Board of Commissioners, which operates the county jail, meets this definition.  *See also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that the ADA definition of "public entity" covers state prisons).

While less than clear, Keller appears to assert both types of claims. The County treats him as doing so, as did the district court. We do the same and hold that Keller cannot succeed under either one.

A.

We first consider Keller's reasonable-accommodation claims. Title II of the ADA "does not expressly define 'discrimination' to include a refusal to make a reasonable accommodation for a person with a disability." *Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020). Rather, Title II's implementing regulations set forth the reasonable-accommodation requirement. *See* 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."). We have previously recognized that refusal to provide a reasonable accommodation can serve as direct evidence of disability discrimination. *See Roell*, 870 F.3d at 488; *Ability Ctr. of Greater Toledo*, 385 F.3d at 907–08. To recover on a failure-to-accommodate claim, the plaintiff must show the following: (1) he is disabled; (2) he was "qualified" to take part in the "services, programs, or activities" of the public entity; (3) he was "excluded from participation in" or "denied the benefits of" such "services, programs, or activities"; and (4) this exclusion or denial occurred "by reason of" his disability. 42 U.S.C. § 12132; *see Ability Ctr. of Greater Toledo*, 385 F.3d at 909–10.

As the district court correctly found, Keller has not offered sufficient evidence to establish a genuine dispute as to whether he was "excluded from participation in" or "denied the benefits of" any "services, programs, or activities" while in jail. 42 U.S.C. § 12132. We have interpreted this portion of Title II to require that covered entities provide "meaningful access" to their services,

programs, and activities. *Ability Ctr. of Greater Toledo*, 385 F.3d at 909; *accord Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 831 F.3d 64, 72 (2d Cir. 2016). And we have held that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (quoting 42 U.S.C. § 12132). Therefore, the denial of meaningful access to medical care, bathroom facilities, or meals could support the required prima facie showing. *See United States v. Georgia*, 546 U.S. 151, 157 (2006); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')." (quoting 42 U.S.C. § 12132)); *Stansell v. Grafton Corr. Inst.*, No. 18-4009, 2019 WL 5305499, at *1 (6th Cir. Aug. 16, 2019) (order); *Wright*, 831 F.3d at 72–74; *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). Keller has been unable to provide evidence that he was denied meaningful access.

1.

Start with the jail's decision to take custody of Keller's inhalers. Officers contacted Dr. Dood so that he could prescribe what he believed to be the appropriate dosage for each of the three inhalers. Jail records reflect the daily administration of each inhaler as directed by Dood, and Keller admits that he received Dood's prescribed treatment. Even though Keller maintains that he should have been given two doses—as opposed to just one—of the Tudorza inhaler each day, Keller's own physician said that one dose per day was the "standard" for this type of inhaler and indicated that he had no issue with Dood's prescription. Though Keller did not have immediate access to his fast-acting inhaler, he was able to use the intercom and emergency call button

available in his cells to seek help when he needed treatment. The record is devoid of any evidence suggesting that jail personnel engaged in undue delay when responding to Keller's calls.

Furthermore, officers consistently reported Keller's breathing episodes to Dr. Dood, who prescribed additional medications as necessary. Keller admits that the nebulizer treatments helped his breathing. And even though officers denied Keller's request to be taken to the hospital before his release, it appears that they took the concern seriously. They consulted Dr. Dood, who advised them not to take Keller to the hospital unless his temperature was low or unless he was turning blue. After receiving that instruction, officers tested Keller's oxygen levels and temperature and found that these metrics were in a safe range. Though Keller may not have received the precise type of medical treatment that he would have preferred, undisputed facts show that he received "meaningful access" to medical treatment. *See Ability Ctr. of Greater Toledo*, 385 F.3d at 907, 909; *see also Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998) (finding that an accommodation was reasonable even though it was not the accommodation that the plaintiff would have most preferred); *Wright*, 831 F.3d at 72 (explaining that a reasonable accommodation "need not be 'perfect' or the one 'most strongly preferred' by the [] plaintiff" (alteration in original) (citation omitted)).

## 2.

Next, consider the dispute surrounding Keller's prosthetic leg. We agree with the district court that the closest Keller comes to establishing a genuine dispute about whether he was deprived of jail services is his asserted difficulty using the toilet in his holding cell. The County points out that Keller admits that he was actually able to use the toilet and sink; but the simple fact that he successfully used them does not necessarily mean that he had meaningful access. Other courts have recognized that a plaintiff who succeeds in using a prison restroom only through an excessive

or painful effort may have a valid ADA claim. *See, e.g.*, *Wright*, 831 F.3d at 70, 73; *Jaros*, 684 F.3d at 672; *Schmidt v. Odell*, 64 F. Supp. 2d 1014, 1033 (D. Kan. 1999).

Keller's case is lacking, however, because, as the district court correctly observed, Keller "provided very little information" about any difficulty accessing the toilet. Keller's limited testimony on this topic relates solely to the holding cell; he offers no evidence that he had trouble reaching the toilet after he was moved to the medical observation cell. Keller testified that he "shuffled" to get to the toilet and sink in the holding cell, but he never explains what that means. Keller's only description of his holding cell was the following:

> It was about the size of this room, with I think only one bench in it. . . . And the bench didn't—like say over there there's maybe like—maybe ten feet or something there was the wall and then the bathroom right there.

Keller does not clarify what "ten feet" refers to, or what it means that the bathroom was "right there." And, as the district court correctly noted, the record does not reveal whether the cell contained any handrails or other assistive devices. Keller's vague description of the holding cell is insufficient to meet his burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). We are left only with Keller's bare assertion that he had a "hard time" getting to the toilet. But "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009); *cf. Cotter v. Ajilon Servs.*, 287 F.3d 593, 598 (6th Cir. 2002) (explaining that plaintiff's "perfunctory statement" that "his colitis restricts his ability to perform manual tasks such as lifting, bending, standing and carrying things" could not allow "a reasonable jury [to] infer that" he was disabled under the ADA), *abrogated in part on other grounds by Lewis v. Humboldt Acquisition*

*Corp.*, 681 F.3d 312, 314–15 (6th Cir. 2012) (en banc); *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) (similar).

The record is similarly lacking in evidence that Keller was denied meaningful access to any other jail services, programs, or activities. Keller notes that his cellmates brought his meals to him after an officer handed them the trays at the door of the holding cell. To be sure, a public entity that forced a plaintiff to rely on the good graces of a third party in order to enjoy program benefits might run afoul of the ADA. *See, e.g.*, *Wright*, 831 F.3d at 74; *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259 (D.C. Cir. 2008). But Keller's testimony does not suggest such a scenario. He offers no evidence that officers would not have handed him meals directly if he had been alone in the holding cell or if his cellmates had not been willing or able. *Cf. Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 285 (1st Cir. 2006) (finding no exclusion from prison programs or services where the plaintiff's "medical need for [a] cane was not obvious and . . . corrections officers would have been available to help [the plaintiff] on his walk to his shower, if he had requested their assistance"). Indeed, the record shows that, when Keller was in the medical observation cell without any cellmates, officers handed him his meals directly. Nor does the record indicate that Keller was ever required to move outside his cell without the use of a wheelchair.

Simply put, Keller has not created a genuine issue of material fact regarding whether the County denied him meaningful access to "the services, programs, or activities" available to detainees. *See Baribeau v. City of Minneapolis*, 596 F.3d 465, 484–85 (8th Cir. 2010); *Moore v. Curtis*, 68 F. App'x 561, 562–63 (6th Cir. 2003). Therefore, the district court properly awarded summary judgment to the County on his failure-to-accommodate claims.

B.

We now turn to Keller's claim that the County intentionally discriminated against him based on his disabilities. To evaluate a claim of intentional disability discrimination that is based on circumstantial evidence, we apply the *McDonnell Douglas* burden-shifting framework. *Anderson*, 798 F.3d at 356 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). First, the plaintiff is required to establish a prima facie case of discrimination. *Id.* at 356–57. To make out a prima facie case, the plaintiff "must show that: (1) [he] has a disability; (2) [he] is otherwise qualified; and (3) [he] was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of [his] disability." *Id.* at 357 (footnote omitted). If the plaintiff makes this prima facie showing, the defendant "must then offer a legitimate, nondiscriminatory reason for its challenged action." *Id.* (internal quotation marks and citation omitted). "If [the defendant] does so—and its burden is merely one of production, not persuasion—[the plaintiff] must then present evidence allowing a jury to find that the [defendant's] explanation is a pretext for unlawful discrimination." *Id.* (alterations in original) (citation omitted).

As already described, Keller has not offered evidence that the County excluded him from, or denied him the benefits of, any jail services by confiscating his inhalers and prosthetic leg. Thus, Keller has failed to make a showing that could establish the existence of this essential element of his case, *see Anderson*, 798 F.3d at 357, and the County was entitled to summary judgment on his intentional-discrimination claims. *See Celotex*, 477 U.S. at 322–23.

IV.

Similar to the ADA, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Keller's Rehabilitation Act claims fail for the same reasons as his ADA claims. *See Doe v. Woodford Cnty. Bd. of Educ.*, 213 F.3d 921, 924–26 (6th Cir. 2000) (recognizing similarities between the ADA and Rehabilitation Act claims); *McPherson*, 119 F.3d at 460, 463 (same). As explained above, Keller has not shown a genuine factual dispute about whether he was excluded from or denied the benefits of jail programs or activities, and he has not otherwise shown that he experienced prohibited discrimination. The district court properly granted summary judgment to the County on Keller's Rehabilitation Act claims.

* * *

We AFFIRM.