RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0015p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

GLORIANNA MOORE,

           *Plaintiff-Appellee*,

    *v.*

OAKLAND COUNTY, MICHIGAN; ERIC HIX; DANIEL
HEDRICK,

           *Defendants*,

BRIAN WILSON,

           *Defendant-Appellant.*

No. 24-1563

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-11187—Denise Page Hood, District Judge.

Decided and Filed:  January 23, 2025

Before:  SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Trevor S. Potter, POTTER, DEAGOSTINO & CLARK, Auburn Hills, Michigan, for Appellant.  Jonathan A. Abent, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

SUTTON, Chief Judge.  When Glorianna Moore refused to show her license to Officer Brian Wilson at a traffic stop, he opened her car door and grabbed her arm.  Because Moore started screaming and twisting her body away, Officer Wilson restrained her by holding her arm

and head until backup arrived.  The encounter led to this § 1983 action against Officer Wilson.  The district court rejected Officer Wilson's motion for summary judgment premised on qualified immunity, reasoning that a jury could find that he violated Moore's clearly established Fourth Amendment rights.  We reverse.

I.

On May 8, 2020, Glorianna Moore drove her car to deliver a Dunkin' Donuts order to a DoorDash customer in Pontiac, Michigan.  Officer Brian Wilson noticed that she was going 50 miles per hour in a 35 mile-per-hour zone.  He stopped her.  Wilson's dashcam and Moore's phone camera captured the next three minutes.

Wilson approached the driver-side window and greeted her:  "What's up, man?"  R.40-4 at 1:27.  Seeing "some type of card in her hand," R.40-3 at 51, he held his palm out and said, "Your license," R.40-4 at 1:31.  Moore responded:  "What am I getting stopped for?  What am I getting stopped for?  I don't have to give you my license."  R.40-4 at 1:33–1:35.  Moore recoiled and moved her hands "towards the center console area . . . where [Officer Wilson] could not see" them.  R.40-3 at 56–57.

Wilson tried to remove Moore from her vehicle.  Telling her, "you're coming out [of] the car," he tried to open the driver-side door from the exterior handle, which was locked.  R.40-4 at 1:37.  He reached through the window to grab Moore's arm and "control her hands."  R.40-3 at 61.  At the same time, Wilson ordered Moore to "Shut the car off."  R.40-4 at 1:37–1:42.  She did not agree to turn off the car.  R.40-4 at 1:42–1:45.  Moore leaned away and loudly objected, "No I don't.  Get off of me.  Get off of me."  R.40-4 at 1:38–1:41.

Things escalated.  Wilson opened the door from the inside and grabbed Moore's arm.  Moore pulled out her phone to capture the encounter.  She began yelling that Wilson had "grabbed on [her] arm," "Get off of me," and "Help," as she thrashed her arm and body to twist away from him.  R.48-25 at 0:10–0:20.  Wilson called for backup.  Attempting to control the situation in the interim, he pulled Moore's arm out of the car with one hand and held her neck down with the other.  R.40-4 at 2:05–2:11.  He repeatedly exclaimed "Stop" and "Relax."  R.40-4 at 2:08–2:20.  That did not work.  Moore continued to struggle against Wilson's grip and

continued to scream.  She protested that he "didn't tell [her] what [she] was pulled over for." R.40-4 at 2:27–2:29.

Two officers arrived a minute later.  The three officers together handcuffed Moore and escorted her into Wilson's patrol car.  According to Officer Wilson, they found an "off white rocky substance" in Moore's car that tested positive for cocaine.  R.40-2 at 7.  Prosecutors charged her with possessing cocaine, obstructing a police officer, and driving without a license.  When a more thorough lab test revealed that the substance was not cocaine, the prosecutors dismissed all of the charges.

Moore sued all three officers and Oakland County under 42 U.S.C. § 1983, alleging that they had violated clearly established Fourth Amendment principles by using excessive force to seize her and thus were not entitled to qualified immunity.  The district court granted summary judgment to each defendant except Wilson.  Wilson appeals.

II.

*Jurisdiction.*  Courts of appeals lack jurisdiction over denials of qualified immunity at summary judgment if the officer does nothing more than contest the record-supported facts provided by the claimant.  *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995).  But we may decide legal questions, such as the meaning of the Fourth Amendment or the contours of clearly established Fourth Amendment principles.  *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014).  We also may decide whether a "reasonable jury could believe" an assertion of fact "blatantly contradicted" by the record.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

We have jurisdiction over this appeal.  Officer Wilson argues that, even accepting Moore's view of the facts as informed by the video evidence, he did not violate clearly established Fourth Amendment excessive-force principles.  No jurisdictional impediment exists.

III.

*Qualified immunity.*  We assess the denial of summary judgment afresh.  *Cochran v. Gilliam*, 656 F.3d 300, 305 (6th Cir. 2011).  Viewing the record-supported facts and inferences in Moore's favor, we ask whether Wilson's qualified-immunity defense contains a "genuine

dispute as to any material fact" worthy of trial. Fed. R. Civ. P. 56(a); *Raimey v. City of Niles*, 77 F.4th 441, 445 (6th Cir. 2023). This claimant-friendly standard, however, does not close our eyes to the evidence presented in Wilson's dashcam or Moore's phone camera, which we are free to assess "in the light depicted by the videotape[s]." *Scott*, 550 U.S. at 381.

Qualified immunity spares officers from "the time, expense and risk of money-damages actions" unless they violate clearly established constitutional rights. *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012). To overcome the defense, Moore must show that (1) the officers violated a "constitutional right" and (2) the right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second question readily resolves this case, making it unnecessary to decide the first one. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In identifying clearly established rights, the Supreme Court warns lower courts against defining them "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The claimant must show that the right's contours were "sufficiently clear" such that "every reasonable official would have understood" that the officer's actions violated it. *Id.* at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That usually means the claimant must identify a case with facts "similar enough that" it "squarely governs this one," *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022) (quotation omitted), what amounts to "on-point caselaw that would bind a panel of this court," *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022).

All of this explains why some Fourth Amendment principles, well established though they are, offer little guidance in qualified-immunity cases. Take the general rule that an arresting officer's force must be "objectively reasonable" given "the facts and circumstances" he faced. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Or take the principle that the reasonableness of an officer's actions turns on the severity of the crime at issue, the threat to police or public safety, and the resistance or not of the suspect. *Id.* at 396. These general principles clearly establish the answer only for obvious violations. For everything else, the clarity of the rule depends "very much on the facts of each case" and the application of refined Fourth Amendment principles. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam).

More helpful, and more in tune with the imperative of defining a right with the requisite specificity, are these Fourth Amendment tenets.  An officer may stop a motorist if he has probable cause of a civil traffic infraction or reasonable suspicion of a crime.  *Cruise-Gulyas v. Minard*, 918 F.3d 494, 496 (6th Cir. 2019).  Because "roadside encounters between police and suspects are especially hazardous," officers may take measures to protect themselves.  *Michigan v. Long*, 463 U.S. 1032, 1049 (1983).  An officer may order the motorist to exit the vehicle.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam).  An officer may frisk the driver and search the passenger compartment for weapons if he reasonably believes that the motorist is armed and dangerous.  *Long*, 463 U.S. at 1049–50.  And an officer may use a reasonable amount of force to conduct the stop.  *Graham*, 490 U.S. at 394–95.

With respect to the use of reasonable force, officers may not subdue a "non-violent, non-resisting, or only passively resisting suspect" with physical force such as tasing, pepper-spraying, or beating them.  *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (per curiam).  Passive resistance, such as merely failing "to exit a vehicle," "does not justify" that degree of force.  *See Browning v. Edmonson County*, 18 F.4th 516, 527 (6th Cir. 2021).

Several examples give contours to this principle.  In one direction are these cases.  In *Smith*, an epileptic man "having a seizure" moved his arm away from an officer.  874 F.3d at 942.  We found it excessive for the officer to use a "leg sweep" to take him to "the ground facedown" and "land[] on top of" him, given the individual's minimal resistance.  *Id.* at 942, 945.  In *Saalim v. Walmart*, an illegally parked driver verbally declined to show an officer his license.  97 F.4th 995, 999 (6th Cir. 2024).  We held that the officer could not respond by trying to wrench him out of the cab, ordering him out at taser-point, shoving him against the car when he exited, and tasing him when he turned to face the officer.  *Id.* at 999–1000, 1009.  So too, if a suspect complies with commands to shut off his car engine and raises his hands, the police may not tase and pepper-spray him simply because he put his arm on the center console to help officers pull him out.  *Wright v. City of Euclid*, 962 F.3d 852, 861, 868 (6th Cir. 2020).

In the other direction are these cases.  An officer may use force to restrain someone who actively resists by physically struggling with police, threatening them, resisting handcuffs, or acting erratically.  *Browning*, 18 F.4th at 527.  If an arrestee "kick[s], flail[s], and wriggl[es]

away" from an arresting officer's grasp, *see Roell v. Hamilton County*, 870 F.3d 471, 482–83 (6th Cir. 2017), or "repeatedly pull[s] his left arm away" from an officer's handcuffs, *Bell*, 37 F.4th at 368, officers may use a taser to restrain him.

These cases inform the answers to two questions raised today. First, was it clearly established that Officer Wilson could not reach into Moore's running car and grab her arm when she refused to produce her license and moved her hands toward the center console? Second, was it clearly established that he could not restrain her arm and hold her head down for two minutes when she screamed and flailed to escape Wilson's grasp?

The answer to both is no. Start with Officer Wilson's initial approach. He used far less force—grabbing Moore's arm—than the officers who tased, pepper-sprayed, and beat their passive suspects. The suspects in those cases, moreover, did not pose a threat to the arresting officer. Moore did. Soon after refusing to produce her license in violation of Michigan law, Mich. Comp. Laws § 257.311, she shifted her hands toward the center console outside of the officer's view. Then she failed to turn off the car, creating another safety risk to the officer standing next to her. A reasonable officer could conclude that, taken together, these factors amounted to active resistance and warranted the modest step of grabbing her arm.

When Moore began screaming and twisting her body to escape Officer Wilson's hold, that made his hold all the more reasonable. As before, he used far less force than in comparable cases in which the officers violated the Fourth Amendment. And as before, Moore actively resisted by trying to "flail[] and wriggl[e] away" from Wilson. *Roell*, 870 F.3d at 482. Her flailing and out-of-control yelling justified a hold to prevent her escape and to move her to Wilson's patrol car. *See United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001).

*Saalim v. Walmart* does not alter this conclusion. Saalim, an illegally parked driver in that case, verbally declined to show an officer his license. We held that the officer's reaction— trying to yank him out of the cab by the arm, then ordering him out at taser-point, then shoving him against the car when he complied, then tasing him when he turned to face the officer— violated a clearly established right "to be free from physical force when one is not actively resisting." 97 F.4th at 999–1000, 1009. But Moore's case differs in kind and degree from

Saalim's case. Moore not only failed to produce her license, but she also kept her car running, shifted her hands toward the center console, and leaned away from Officer Wilson. After Wilson tried to control Moore's hands, she screamed and twisted to evade him. By contrast, Saalim did nothing more than verbally decline to produce his license and turn to ask "what he had done wrong" after being shoved against his car. *Id.* at 999. Even with Moore's active resistance, Wilson did not "pull" her out of the car, "shove[]" her against the cab when she exited, or tase her as the officer in *Saalim* did. *Id.* at 1003, 1008. The two fact patterns reconcile themselves.

Moore contends that the video footage shows that she did not move her hands toward the center console. But it does not show her hands, one way or another, at that point. That leaves three pieces of uncontradicted evidence that she moved her hands toward the console during the encounter: Officer Wilson's case report, his deposition, and his state-court testimony. Because Moore did not provide any testimony or other evidence to the contrary, we must rely on the evidence in the record on this score. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

Moore insists that the video shows that she moved toward the center of her vehicle only after Officer Wilson grabbed her. That misapprehends Officer Wilson's argument. Everyone agrees that Moore "pull[ed] away" once he reached into her car. R.40-6 at 16. Before that, however, Officer Wilson testified that she put her hands "in to the center console area" outside the dashcam's view. R.40-6 at 16. Only Wilson's testimony, reaffirmed by his case report and deposition, addresses Moore's earlier maneuver.

Moore claims that two other cases show that a reasonable officer would not conclude that a suspect posed a threat by moving her hands toward the center console. But in the first one, *Browning*, the police tased an unconscious minor in the backseat of a crashed car who made no threatening movements. 18 F.4th at 521–22. In the second one, *Wright*, after the suspect complied with orders to turn off the car and raise his hands, an officer pepper-sprayed him at point-blank range when he put his hand "on the center console . . . to better situate his torso" around a colostomy bag to exit the car in compliance with the officers' orders. 962 F.3d at 861. Officer Wilson's efforts, in contrast, fairly amount to a reasonable officer's "split-second judgment[]" in "tense, uncertain, and rapidly evolving" circumstances to use some force to stop

or arrest a suspect. *Graham*, 490 U.S. at 397. On this record, no clearly established Fourth Amendment violation occurred.

We reverse.