NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0072n.06

No. 25-5461

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

ANTHONY CAMARCA,

     Plaintiff-Appellant,

v.

CITY OF COVINGTON POLICE DEPARTMENT; OFFICER ROSS WOODWARD; OFFICER ROBERT CHRISTEN; OFFICER BRADLEY MORRIS; OFFICER SAMUEL MATHEWS; SERGEANT MICHAEL GILLILAND,

    Defendants-Appellees.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

**FILED**
Feb 04, 2026
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

OPINION

</td></tr>
</table>

Before: COLE, MATHIS, and HERMANDORFER, Circuit Judges.

HERMANDORFER, Circuit Judge. After attending a family wedding and reception, Anthony Camarca, his wife Sara, and several others continued their celebration late into the night. The group eventually arrived back at their hotel and gathered in the lobby; by that point, several party members were far from sober. Things devolved further until, sometime around 3:30 a.m., a physical altercation between Sara and her sister broke out. The lobby ruckus prompted a hotel staff member to call 911. What happened next led to a police altercation, multiple arrests, and an injury to Camarca during officers' struggle to subdue him. It also led to this lawsuit, in which Camarca alleges various federal-constitutional and state-law claims against the City of Covington,

Kentucky Police Department and the officers present at the hotel. The district court granted summary judgment to the defendants across the board. We affirm.

I

A

In mid-October 2021, Anthony Camarca attended his brother-in-law's wedding with friends and family at a venue near Covington, Kentucky. After the ceremony, at around 7:00 p.m., Camarca, his wife Sara, his sister-in-law Lacye, and others went to an open-bar reception. Camarca recalls drinking "approximately three to five beers" at the reception. Camarca Dep., R.41, PageID 435. After briefly stopping by their Marriott hotel in Covington around midnight, Camarca, Sara, Lacye, and several other wedding-party members ventured out to another bar until closing time. They returned to the hotel sometime after 2:00 a.m., purchased additional alcohol, and continued to "party" in the lobby. *E.g.*, Sara Dep., R.47, PageID 924. At that point, things were "a little blurry" for Lacye, but she "wasn't totally blacked out yet." Lacye Dep., R.43, PageID 553. Sara was also "intoxicated" and thought Camarca, too, was "intoxicated." Camarca Dep., R.41, PageID 445; Sara Dep., R.47, PageID 944, 950.

At around 3:30 a.m., the partying took a turn for the worse. Sara and Lacye began fighting—yelling "obscenities at each other" and "rolling around on the ground"—in the hotel lobby. Camarca Dep., R.41, PageID 444. The hotel clerk called 911. She requested law-enforcement assistance because two females were "fighting in [her] lobby" and other individuals were "screaming." 911 Audio, R.38-3, 0:08-0:12, 0:40-1:00. Although the fighting had stopped, the hotel clerk thought it might continue, and for her "safety" wanted an officer to tell the guests to either go to their rooms or leave the premises. *Id.* at 0:20-0:40. She also explained that the

individuals were "intoxicated." *Id.* at 1:13-1:20. Officers Ross Woodword, Ryan Christen, Sam Mathews, and Brad Morris, along with Sergeant Michael Gilliland, were dispatched to the hotel.

Officer Woodward arrived at the hotel just past 3:30 a.m. The hotel clerk met Officer Woodward and explained that Lacye, who was then sitting on the curb outside, was "one of them," and provided a description of Sara, who had remained in the lobby. Woodward Body-Worn Camera Footage ("BWC"), R.38-4, 3:33:10-3:33:27. Officer Woodward approached the wedding-party members in the lobby. He then told everyone to go to their rooms—except Sara, who was "not free to leave yet." *Id.* at 3:33:48-3:34:03. When Camarca asked for clarification, Officer Woodward responded that it "doesn't concern you." *Id.* at 3:34:04-3:34:07. Camarca replied that it did "concern" him because Sara was his wife. *Id.* at 3:34:07-3:34:11. Camarca then called Officer Woodward a "piece of sh*t," asserted that he and Sara were "going to [their] room," and put his arm on Sara to usher her away. *Id.* at 3:34:12-3:34:21. As Camarca tells it, although he heard Officer Woodward "inform[] [his] wife that she was not free to leave," Camarca "grabbed [his] wife's waist" and "attempted to turn her around to go to [their] room." Camarca Dep., R.41, PageID 452-53.

As Camarca began to direct Sara away, Officer Woodward told Camarca that now he, in addition to Sara, was "not free to leave yet." Woodward BWC, R.38-4, 3:34:18-3:34:22. Camarca retorted that "I am free to leave," released Sara, began to turn towards Officer Woodward, and said "you can suck a d*ck." Christen BWC, R.38-7, 3:34:19-3:34:23. At that point, Officer Woodward concluded that Camarca was intoxicated given the "odor" of alcohol emanating from him, "how aggressive he was," and his "shouting." Woodward Dep., R.45, PageID 744-45, 771-72.

As Camarca began to turn in Officer Woodward's direction, Woodward grabbed him with the intent to detain him and pushed him into a wall. Officer Christen, who had just arrived on

scene, attempted to help Officer Woodward, but Camarca actively resisted—including by trying to push Officer Christen. Officer Woodward then tackled Camarca to the ground, where Camarca continued to struggle. While resisting arrest on the ground, Camarca yelled additional profanity-laden insults at Officer Woodward and told him that "I'll beat your ass you f*cking c*cksucker." Christen BWC, R.38-7, 3:34:30-3:34:45.

Officer Woodward eventually secured Camarca's arms, and Officer Christen placed the prone-positioned Camarca in handcuffs. After about 30 seconds on the ground—during which Camarca asked for his lawyer and continued to call Officer Woodward a "piece of sh*t" and a "f*ggot"—Officer Woodward grabbed Camarca's left arm to help him up. *Id.* at 3:35:07-3:35:40. But Camarca had difficulty standing and was leaning away from Officer Woodward, so Officer Woodward released his grip in a flinging motion, and Camarca fell down against a nearby wall. As he tumbled, Camarca asserted that Officer Woodward "broke [his] leg." *Id.* at 3:35:38-3:35:41. While on the ground, Camarca hurled more expletives toward the officers while repeatedly stating that his leg was broken. Officers Woodward and Christen then helped Camarca up and escorted him out of the hotel as Camarca hopped on his non-injured leg. An ambulance eventually arrived to transport Camarca to the hospital. Camarca suffered a broken leg and ankle from the encounter.

B

For his conduct at the hotel, Camarca was charged with four state criminal offenses: alcohol intoxication in a public place, resisting arrest, second-degree disorderly conduct, and menacing. He ultimately pled guilty to public intoxication, and the remaining charges were dismissed. Sara, for her part, was charged with alcohol intoxication in a public place and second-degree disorderly conduct, but those charges were later dropped after she completed a diversion program. Another

4

wedding-party member also received a second-degree disorderly conduct charge and eventually pled guilty to public intoxication.

Camarca sued the officers in their individual capacities as well as the City of Covington Police Department, asserting various claims under 42 U.S.C. § 1983 and state law. He alleged that Officers Woodward and Christen violated his Fourth Amendment rights by seizing him without reasonable suspicion or probable cause, and by using excessive force to subdue him. He asserted failure-to-intervene claims against Sergeant Gilliland, Officer Morris, and Officer Mathews, who were at the hotel but did not actively participate in Camarca's arrest. Camarca further alleged that each of those officers violated his Fourteenth Amendment equal-protection and due-process rights. He added a municipal-liability claim against the Covington Police Department. And he asserted a number of tort claims under Kentucky law.

The district court granted summary judgment to the defendants on all claims. It concluded that the officers did not violate Camarca's constitutional rights and that, even if they had, they were still entitled to qualified immunity because Camarca failed to show that clearly established law prohibited the officers' conduct. The district court further determined that Camarca failed to create a genuine dispute of material fact on his municipal-liability and state-law claims. Camarca timely appealed.

II

We review the district court's grant of summary judgment de novo. *See Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024). "To overcome qualified immunity," Camarca must show that the individual officers "(1) violated a constitutional right that was (2) clearly established." *VanPelt v. City of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023). We view the "record-supported facts and inferences" in Camarca's favor and ask whether the officers' "qualified-immunity defense contains

5

a 'genuine dispute as to any material fact' worthy of trial." *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quoting Fed. R. Civ. P. 56(a)). But that standard "does not close our eyes to the evidence presented" by bodycam or other footage, "which we are free to assess in the light depicted by the videotapes." *Id.* (cleaned up).

## III

Camarca asserts several categories of constitutional claims against the individual officers present at the hotel. He also presses a set of municipal-liability claims against the City of Covington Police Department. Finally, Camarca asserts related state-law claims against the individual arresting officers. The district court concluded that none of Camarca's arguments could prevail against the defendants' motion for summary judgment. We agree.

## A

Camarca first advances a series of claims against the on-scene officers in their individual capacities. He asserts that Officers Woodward and Christen violated his Fourth Amendment rights by unreasonably seizing him and using excessive force; that Officers Morris and Mathews, as well as Sergeant Gilliland, violated his constitutional rights by failing to intervene; and that each of those officers violated his Fourteenth Amendment equal-protection and due-process rights. We consider, and reject, each argument in turn.

## 1

We start with Camarca's contention that Officers Woodward and Christen violated his Fourth Amendment rights by detaining and arresting him without reasonable suspicion or probable cause. We agree with the district court's grant of summary judgment to the officers on that unreasonable-seizure claim.

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Officers seeking to detain or arrest an individual thus must have an adequate constitutional basis for doing so. Relevant here, officers generally must have probable cause before effectuating a warrantless arrest. *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018). Probable cause "exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Frenchko v. Monroe*, 160 F.4th 784, 796 (6th Cir. 2025) (citation omitted). "Probable cause is a low bar." *Id.* (citation modified). If an "officer has probable cause to believe that the suspect committed a crime in the officer's presence," a "warrantless arrest is reasonable." *Id.* (citation omitted). In qualified immunity cases, we ask whether these standards were met when "viewed from the standpoint of an objectively reasonable police officer." *Id.* (quoting *Wesby*, 583 U.S. at 56-57).

Camarca claims that Officers Woodward and Christen lacked an adequate basis to detain him in the moments leading up to their altercation in the hotel lobby. We disagree. For the reasons given below, there is no genuine dispute that, at all relevant times, the officers had probable cause to believe that Camarca had unlawfully obstructed governmental operations under Ky. Rev. Stat. § 519.020. Because that conclusion suffices to dispose of Camarca's unreasonable-seizure claim, we need not address whether officers also had reasonable suspicion or probable cause to believe that Camarca was "manifestly under the influence of alcohol" in violation of Ky. Rev. Stat. § 222.202(1).

At issue is Ky. Rev. Stat. § 519.020. A person violates that statute "when he intentionally obstructs, impairs or hinders the performance of a governmental function by using or threatening to use violence, force or physical interference." *Id.* § 519.020(1). That fits Camarca's conduct.

In Camarca's own words—backed up by the bodycam footage—Officer Woodward "informed [his] wife that she was not free to leave." Camarca Dep., R.41, PageID 452. Camarca also assumed that Officer Woodward was only in the lobby in response to a call about the fight between Sara and Lacye. But despite Officer Woodward's order, Camarca "grabbed [his] wife's waist" and "attempted to turn her around to go to [their] room." *Id.* at PageID 453.

At that point, Officer Woodward could reasonably conclude that Camarca—by physically ushering Sara away in defiance of Officer Woodward's order—was obstructing Officer Woodward's investigation of the fight between Sara and Lacye. *See* Ky. Rev. Stat. § 519.020(1); *cf. Daniel v. Cox*, 1997 WL 234615, at *3 & n.2 (6th Cir. 1997) (per curiam) (reasonable to believe violation of section 519.020(1) where suspect prevented officer from entering home to conduct lawful search). That satisfies the "low bar" for probable cause. *Frenchko*, 160 F.4th at 796 (citation omitted). And, in assessing whether officers had probable cause to arrest Camarca, it's irrelevant that Camarca was not ultimately charged under section 519.020. *See Amis v. Twardesky*, 637 F. App'x 859, 861 (6th Cir. 2015). With probable cause present, Officers Woodward and Christen did not violate the Fourth Amendment when they detained Camarca moments after his attempt to usher Sara away from an active investigation.

Camarca's counters are not convincing. He first contends that his "hand was actually off his wife" before the seizure occurred, creating a fact question regarding whether he "was truly physically interfering with a governmental function." Camarca Br. 20. But both the bodycam footage and Camarca's own deposition testimony directly contradict that assertion. They instead demonstrate that Camarca had his arm around Sara, was attempting to lead her away from Officer Woodward, and let go of her only when Camarca began to turn toward Officer Woodward while telling the officer to "suck a d*ck." Christen BWC, R.38-7, 3:34:18-3:34:22. There is "no genuine

dispute" that those facts provided an objective basis to conclude that Camarca was impeding Woodward's investigation. *Alford v. Deffendoll*, --- F.4th ----, 2026 WL 183860, at *4 (6th Cir. 2026); Fed. R. Civ. P. 56(a).

Camarca also notes that section 519.020(1) does not apply to "[a]ny means of avoiding compliance with the law without affirmative interference with governmental functions." Ky. Rev. Stat. § 519.020(2)(a). Apparently, Camarca sees his actions as falling short of that "affirmative interference" bar. *Id.* We fail to see how: Camarca engaged in "physical interference" with Officer Woodward's investigation by using his arm to move Sara away. *Id.* § 519.020(1). So his statute-based argument fails on its own terms.

To the extent Camarca alternatively argues that "mere refusals without any verbal threats of physical violence" do not amount to "affirmative interference," Camarca Br. 21-22, he gets no further. On the merits, Camarca's interpretation lacks any support in the statute's text or structure or in any state-law cases. Nor does Camarca's lone unpublished district court decision on section 519.020(1) counsel otherwise. That decision reasoned that "threatening statements" made to police constituted "affirmative interference." *Roberts ex rel. Est. of Roberts v. Girder*, No. 6:15-cv-160, 2018 WL 3543045, at *7 (E.D. Ky. July 23, 2018). It did not purport to limit the statute's scope to verbal threats of violence in the way Camarca claims. *Id.* And in any event, a single unpublished, non-binding decision cannot define clearly established law. *See Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022). So the officers are entitled to qualified immunity from Camarca's claim twice over.

In short, the officers had probable cause to apprehend Camarca under Ky. Rev. Stat. § 519.020. We affirm the grant of summary judgment to Officers Woodward and Christen on Camarca's unreasonable-seizure claim.

2

Camarca also challenges the district court's grant of summary judgment to Officers Woodward and Christen on his excessive-force claim. But Camarca's arguments again fail to persuade.

The Fourth Amendment protects against the "use of excessive, or unreasonable, force in the context of an arrest or investigatory stop." *King v. City of Rockford*, 97 F.4th 379, 393 (6th Cir. 2024) (citation modified). "Because police officers making split-second decisions usually face a range of acceptable options, we must defer to the officer's on-the-spot judgment in deciding what was reasonable." *VanPelt*, 70 F.4th at 340 (citation modified). So courts "don't critique police officers' actions with the 20/20 vision of hindsight." *Id.* (citation modified). We instead look to the "totality of the circumstances," including factors like "the severity of the crime at issue," whether the "suspect pose[d] an immediate threat to the safety of the officers or others," and whether the "suspect is actively resisting arrest or attempting to evade arrest by flight." *King*, 97 F.4th at 393 (citation omitted).

Qualified immunity doctrine provides further protection: It permits a suit against officers to proceed only if their conduct violated "clearly established" rules that "placed" the "constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2017) (per curiam) (citation omitted). That standard "requires a high degree of specificity." *Wesby*, 583 U.S. at 63 (citation modified). The relevant "legal principle" must "clearly prohibit the officer's conduct *in the particular circumstances before him*." *Id.* (emphasis added).

Camarca contends that Officers Woodward and Christen used excessive force four different times during the hotel-lobby encounter: (1) when Officer Woodward first attempted to subdue Camarca by grabbing and shoving him into a nearby wall, (2) when Officer Woodward

10

tackled Camarca to the ground and Officer Christen handcuffed him, (3) when Officer Woodward helped Camarca stand up, only to release his grip and let Camarca fall to the ground, and (4) when Officers Woodward and Christen escorted Camarca out of the hotel, requiring Camarca to hop on his non-broken leg. Based on the totality of the circumstances, we agree with the district court that the officers were entitled to qualified immunity on these claims.

*The shove*. Camarca complains about the moment when Officer Woodward first attempted to subdue him. Camarca characterizes Officer Woodward's actions as "slamming" him "into the wall." Camarca Br. 27. But the "use of colorful verbs" in a brief doesn't amount to a showing of "excessive force." *Smigelski v. Cluley*, No. 23-3322, 2023 WL 11074139, at *3 (6th Cir. Dec. 26, 2023) (order). Nor does "'every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violate[] the Fourth Amendment." *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 697 (6th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

We agree with the district court that, in view of the bodycam footage, Officer Woodward at most shoved Camarca against a nearby wall after Camarca defied his order, was verbally aggressive, and began to turn towards him. That contact was not excessive under our totality-of-the-circumstances approach.

First, Officer Woodward was entitled to respond to Camarca's conduct of "disobeying" Woodward's orders. *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citation omitted). Camarca disregarded Officer Woodward's directive twice: first, when he physically moved Sara away after Officer Woodward ordered that she was "not free to leave," and second, when he disobeyed Woodward's command that Camarca also wasn't "free to leave"—including by countering that "I am free to leave" and telling Woodard to "suck a d*ck." Woodward BWC, R.38-4, 3:34:00-3:34:23. Given Camarca's "outward manifestation" of defiance, Officer

11

Woodward permissibly concluded that Camarca was actively resisting his commands. *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 612 (6th Cir. 2020) (citation omitted).

Second, Officer Woodward also reasonably believed that Camarca—who later pled guilty to public intoxication—was under the influence: Camarca was "aggressive," "shouting," and smelled like alcohol. Woodward Dep., R.45, PageID 744-45, 771-72. Alcohol intoxication can turn a relatively tame situation into a "volatile" one and increase the "threat" posed to officers. *Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007). So the more "intoxicated and noncompliant" a suspect—and Camarca was both—the "[m]ore force" an officer may reasonably use. *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008).

Third, Officer Woodward's shove was not unprompted. Instead, the video evidence demonstrates that Woodward's initial contact came after Camarca's "verbally abusive" conduct and action of turning his body back towards Officer Woodward's direction. *Lockett v. Donnellon*, 38 F. App'x 289, 292 (6th Cir. 2002) (per curiam).

The initial degree of force—shoving—that Officer Woodward employed was not an unreasonable response given all of the facts that Woodward faced. *Cf. Rudlaff*, 791 F.3d at 641; *Thomas v. City of Eastpointe*, 715 F. App'x 458, 461 (6th Cir. 2017). The district court thus properly granted summary judgment on the shove-based claim.

*The tackle*. Camarca next contends that Officers Woodward and Christen used excessive force when, moments after the shove, the ensuing encounter resulted in Officer Woodward tackling Camarca to the ground and Officer Christen handcuffing him. We disagree. The bodycam footage shows that, as Officers Woodward and Christen attempted to subdue Camarca, Camarca began "physically struggling with" them, including by attempting to push Officer Christen. *Rudlaff*, 791 F.3d at 641 (citation omitted). And that happened right after Camarca was "verbally hostile" and

12

disobeyed Officer Woodward's orders. *Browning v. Edmonson County*, 18 F.4th 516, 527 (6th Cir. 2021). Camarca, once again, thus "actively resist[ed]," which we have previously reasoned justifies the application of greater force. *Rudlaff*, 791 F.3d at 641. Officer Woodward's "more moderate use of force"—tackling—was a reasonable "split-second judgment[]" given Camarca's physical and verbal aggression. *VanPelt*, 70 F.4th at 340. And once Officer Woodward grounded Camarca, Camarca continued to resist by "refusing to move [his] hands for the police to handcuff [him]," *Rudlaff*, 791 F.3d at 641, called Officer Woodward a "f*ggot" and "c*cksucker," and threatened to "beat [his] ass," Christen BWC, R.38-7, 3:34:30-3:34:45. In the face of Camarca's active resistance and threats, the officers' attempts to handcuff Camarca—which involved holding him down to prevent him from moving—did not amount to excessive force. *See Rudlaff*, 791 F.3d at 641.

Camarca's counterarguments effectively amount to unreasonable interpretations of the bodycam footage. He contends that he didn't actively resist but was instead "scared" and in a lot of pain, causing him to "squirm." Camarca Br. 34. "[O]ur excessive-force analysis," however, "is an objective one." *VanPelt*, 70 F.4th at 341 (citation omitted). And at the point of his initial takedown by the officers, Camarca had not given any signals that he was in pain. So the officers, lacking any signs of an "obvious physical problem" or "plea" from Camarca about his injury, reasonably interpreted Camarca as resisting. *O'Malley v. City of Flint*, 652 F.3d 662, 672 (6th Cir. 2011) (citation omitted). As to Camarca's argument that his aggressive actions could be viewed as him attempting to "surrender," Camarca Br. 35-36, the bodycam footage blatantly "contradicts" it, *VanPelt*, 70 F.4th at 341. So Camarca has not created a genuine dispute over whether the tackle and subsequent application of handcuffs constituted excessive force.

*The release.* Soon after the tackle, as Camarca was positioned on the ground in handcuffs, Officer Woodward grabbed Camarca by the left arm to stand him up. But as Officer Woodward began to do so, Camarca stumbled to the right, and Officer Woodward released his grip and raised his arm in a flinging motion; Camarca then fell to the ground and hit his back on a nearby wall. As Camarca fell, he asserted that Officer Woodward broke his leg. Camarca characterizes Officer Woodward's actions as "throwing a compliant and injured Mr. Camarca head-first to the wall," which he says constituted excessive force. Camarca Br. 38.

Central aspects of Camarca's characterization conflict with the bodycam footage. Although Officer Woodward used an upward hand motion to release Camarca once Camarca began falling, Woodward did not "throw[]" Camarca into the wall. *Id.* And Camarca did not go "head-first" into the wall; his back hit a nearby wall with minimal impact. *Id.* We've previously held that an officer does not use excessive force by helping a suspect "to his feet" only to "release[] his grip" after the suspect complained of an injury. *VanPelt*, 70 F.4th at 341. Here, Camarca hadn't even complained of an injury until after Officer Woodward let go of him, so a reasonable officer wouldn't have known of it. *Cf. O'Malley*, 652 F.3d at 671-72. Nor has Camarca pointed to any case that clearly establishes otherwise. As the district court noted, that failure independently forecloses his claim under qualified immunity caselaw. Order, R.60, PageID 1351-52; *see Bell*, 37 F.4th at 368.

*The escort.* Finally, Camarca claims that Officers Woodward and Christen used excessive force by requiring him to hop on his non-broken leg as they escorted him out of the hotel lobby. But the officers' helping Camarca exit the premises—they held Camarca up on each side as he hopped out of the lobby—does not constitute an application of force, let alone excessive force. *Cf. Fair v. Turley*, No. 24-1846, 2025 WL 1190124, at *1 (9th Cir. Apr. 24, 2025) ("forcing" suspect

to "walk on his injured leg" deemed not excessive force as officers held "a belief—reasonable at the time—that [he] either was feigning an injury or was not seriously injured").

And even if Camarca had shown a constitutional violation, his claim would fail at the clearly established prong of the qualified immunity inquiry because he cites only unpublished decisions of our Court in support of his claim. That's because "unpublished cases cannot define clearly established law." *Campbell*, 109 F.4th at 861 (citation omitted). Without any "on-point caselaw that would bind a panel of this court," Camarca cannot show that the officers violated his clearly established rights. *Bell*, 37 F.4th at 368.

3

Camarca next asserts failure-to-intervene claims against Officer Morris, Officer Mathews, and Sergeant Gilliland. Those officers, recall, were on scene at the Marriott at various points but did not directly participate in Camarca's apprehension. In Camarca's view, Morris, Mathews, and Gilliland violated their legal duty to prevent Officer Woodward's and Officer Christen's unconstitutional misconduct. For the reasons given above, however, we agree with the district court that there was no violation of Camarca's constitutional rights. *Cf. Bunkley v. City of Detroit*, 902 F.3d 552, 565-66 (6th Cir. 2018) (reciting elements of failure-to-intervene claim). Because Officer Woodward's and Officer Christen's "conduct was not unconstitutional," the other on-scene officers "had no duty to intervene." *Harris v. Hofbauer*, 2000 WL 1175662, at *1 (6th Cir. 2000) (table). We therefore need not address the officers' separate arguments that they arrived too late to witness and intervene in the challenged acts by Officers Woodward and Christen.

4

The last category of federal claims against the individual officers involves allegations that they violated Camarca's equal-protection and due-process rights. Camarca, though, does not

15

advance an argument under the Due Process Clause. So he's forfeited any due-process theory on appeal. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022).

Camarca's equal-protection claim, for its part, does not allege that the officers acted based on a suspect characteristic or in a way that burdened a fundamental right. Instead, Camarca asserts what is known as a class-of-one claim: He says that the officers—by detaining, arresting, and using force against Camarca—treated him differently than other, similarly situated members in the lobby without a rational basis for doing so. *Cf. Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). For support, Camarca notes that Sara also was "verbally rude" to officers and attempted to interfere with the officers' duties. Camarca Br. 45. He makes similar arguments about the conduct of other individuals who were present in the Marriott lobby when the officers arrived.

The district court properly rejected Camarca's equal-protection arguments. As for the officers' decision to initiate arrest, Camarca's theory fails on its own terms: Far from singling out Camarca for differential treatment, the officers also arrested his wife, Sara, and her brother. And regardless, the officers had probable cause to believe that Camarca was engaging in criminal activity. *See supra* p. 8. For purposes of Camarca's class-of-one claim, arresting Camarca for his conduct thus implicated "legitimate state interests" and provided a rational basis for the officers' actions, *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005), even if other individuals in the lobby did not face the same outcomes, *see Avila v. Pappas*, 591 F.3d 552, 554 (7th Cir. 2010).

Nor do the officers' actions during Camarca's arrest support an equal-protection claim. Camarca's substantial physical resistance to the officers' arrest attempt distinguished him from his cited comparators. *See Lathfield Invs., LLC v. City of Lathrup Village*, 136 F.4th 282, 303 (6th Cir. 2025) (comparators must be similar in "all relevant respects"). As it relates to the conduct of

16

his arrest, Camarca therefore has not demonstrated that any officer treated him differently from "similarly situated persons," Order, R.60, PageID 1350 (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)), let alone engaged in differential treatment that lacked a rational basis. Entry of summary judgment for the defendant officers on Camarca's equal-protection claim was proper.

B

In addition to asserting claims against individual officers, Camarca seeks to hold the City of Covington liable under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Boiled down, Camarca's theory appears to be that the Covington Police Department failed to provide adequate training on proper arrest, detention, and use-of-force procedures. From there, Camarca claims that the Department's training failure led to the violation of his constitutional rights. But a municipality "cannot be liable" under *Monell* "absent an underlying constitutional violation by its officers." *Hester v. Chester County*, 162 F.4th 780, 790 (6th Cir. 2025) (quoting *Roell v. Hamilton County*, 870 F.3d 471, 487 (6th Cir. 2017)). Here, for reasons already given, Camarca "fails to establish a constitutional violation," meaning "his *Monell* claim" likewise fails. *Id.*

C

Camarca last presses the state-law claims of assault and battery and intentional infliction of emotional distress against the individual officers and seeks punitive damages for those claims. But as Camarca acknowledges, his theory of relief on the state-law claims depends on his "[h]aving established" a violation of his federal constitutional rights. Camarca Br. 51. And for the reasons given above, the defendant officers are entitled to summary judgment on the federal claims. So Camarca's state-law claims fail on that basis.

17

Nor does Camarca's opening brief otherwise press any challenge to the district court's analysis, which rejected Camarca's claims on additional state-law grounds. Instead, Camarca mentions the district court's bottom-line state-law conclusion only in a "perfunctory manner, unaccompanied by some effort at developed argumentation." *Buetenmiller*, 53 F.4th at 946 (citation omitted). Camarca has therefore forfeited any other bases for attacking the district court's entry of summary judgment on the state-law claims. *See id.*

\* \* \*

We affirm the judgment of the district court.