RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FAHIRRI DANNAH,

*Plaintiff-Appellee*,

*v.*

CITY OF GRAND RAPIDS, MICHIGAN, et al.,

*Defendants*,

ANTHONY BARBERINO, ZACHARY KAISER, and
MELISSA MONINGER, in their individual capacities,

*Defendants-Appellants*.

No. 25-1416

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cv-00385—Ray S. Kent, Magistrate Judge.

Decided and Filed:  May 29, 2026

Before:  SUTTON, Chief Judge; LARSEN and MURPHY, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Sarah J. Hartman, Elizabeth J. Fossel, GRAND RAPIDS DEPARTMENT OF
LAW, Grand Rapids, Michigan, for Appellants.  Michael L. Jones, MARKO LAW, PLLC,
Detroit, Michigan, for Appellee.

_____

### OPINION

_____

SUTTON, Chief Judge.  A Grand Rapids police officer frisked Fahirri Dannah during a

traffic stop.  Before the officer could complete the pat down, Dannah twisted away and started to

run.  Officers tackled him and wrestled with him until they could place handcuffs on him.  Dannah filed this § 1983 action against several of the officers.  The district court rejected the officers' qualified-immunity defense, reasoning that a jury could find that they violated Dannah's clearly established Fourth Amendment rights.  Because the officers did not violate any clearly established law, we reverse.

I.

On the night of November 16, 2019, as Dannah and his girlfriend drove to a Taco Bell, officers stopped the vehicle for a traffic infraction.  Dannah's girlfriend, the driver, gave the officers permission to search her car.  Officer Zachary Kaiser asked Dannah to exit the vehicle before the officers conducted the search.

As Dannah emerged from the vehicle, Officer Kaiser asked him to place his hands on top of his head and face away.  Dannah, facing toward Officer Kaiser, moved his arms toward his waist and lifted his shirt, insisting that he did not have any weapons.  Officer Kaiser again asked Dannah to place his hands on his head, nudging his arm upwards.  Dannah, upset, moved an arm down, and Officer Kaiser grasped it and pulled it up toward Dannah's head.  Dannah and Officer Kaiser walked a few steps away to a police cruiser.  As they stopped, Dannah moved his hands back to his waist again.  Officer Kaiser said, "Hey—we've got to pat you down first, okay.  Hands on top of your head," and nudged Dannah's arms back toward his head.  R.85-7 at 11:07–14.  Officer Kaiser asked Dannah whether there were any items he needed to know about.  Dannah insisted that he did not have any weapons.

Officer Kaiser began to pat Dannah down.  He paused over Dannah's right pocket and asked, "What's this in your pocket here?"  R.85-7 at 11:44–46.  Dannah, starting to move, said, "Wait a minute, hold on—", and brought his arms down.  R.85-7 at 11:47–49.  Several officers commanded Dannah to keep his hands on his head, but he kept moving.  One of the officers shouted, "STOP!"  R.85-7 at 11:48–49.  Dannah escaped Officer Kaiser's grasp and tried to run away.

Officers grabbed Dannah and brought him to the ground.  Dannah curled into a fetal position as several officers commanded, "Hands behind your back!"  R.85-7 at 11:59–12:13;

R.85-8 at 11:32–43. Dannah refused to release his hands held in front of him, prompting more struggle. Some officers tried to grasp Dannah's arms to pull them behind him, punching him in the side as they wrestled with him. Other officers tried to grab Dannah's legs as he flailed and leaned against Dannah's body to stop his movement. Dannah fought against their efforts for several minutes. The officers eventually brought both of his arms back and handcuffed him. The officers arrested him for assault, battery, and resisting a police officer.

Roughly two years after his arrest, Dannah sued the arresting officers and the City of Grand Rapids under 42 U.S.C. § 1983, alleging that Officer Kaiser unlawfully searched and seized him and that several officers used excessive force. The officers moved for summary judgment on qualified-immunity grounds. The district court granted summary judgment to Officer Kaiser on Dannah's search and seizure claims and to the City on his *Monell* claim. But the court denied qualified immunity on the excessive force claims against several officers. The officers appealed.

## II.

*Jurisdiction*. We have jurisdiction over interlocutory appeals from the denial of an officer's claim that qualified immunity protects him from a lawsuit. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). An exception exists for a small number of cases in which the officers premise their appeal solely on challenges to record-supported facts. *Johnson v. Jones*, 515 U.S. 304, 313–17 (1995); *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014). In this instance, the officers accept the record-supported facts of the encounter, most of which are captured by body cameras worn by the officers. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Jurisdiction exists.

## III.

*Qualified immunity*. We give fresh review to whether the officers' qualified-immunity defense contains a genuine dispute as to any material fact, and we weigh all record-supported facts and inferences in Dannah's favor. Fed. R. Civ. P. 56(a); *Cochran v. Gilliam*, 656 F.3d 300, 305–06 (6th Cir. 2011).

Qualified immunity saves officers "the time, expense and risk of money-damages actions unless they violate clearly established constitutional rights." *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quotation omitted). That imperative requires Dannah to show that the officers violated a "constitutional right" *and* that the right was "clearly established." *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). Dannah has not established the latter, making it unnecessary to decide the former. *Id.*

In identifying clearly established rights, a claimant must demonstrate that the contours of the right were "sufficiently clear" that "reasonable offic[ers] would understand" that their actions violated it. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has "repeatedly told courts" not to define rights at "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The claimant instead must identify precedent "with facts similar enough that it squarely governs" his case, *Moore*, 126 F.4th at 1167 (quotation omitted), showing "a violation beyond debate," *Aaron v. King*, 171 F.4th 822, 826 (6th Cir. 2026) (quotation omitted). "[S]pecific cases are especially important" when it comes to discerning the context-rich boundaries of "excessive" force. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022) (quotation omitted).

In this instance, no clearly established right prevented the officers from using force to rein in Dannah's "volitional and conscious defiance" during the frisk. *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024) (quotation omitted). Consider the circumstances. Dannah refused to comply with the officers' instruction from the start. When the officers pulled Dannah aside to conduct a frisk, he "kept placing his hands down by his waistband" even after repeated commands to place his hands on his head. R.99 at 8. The interaction devolved into a physical struggle when Dannah broke away from Officer Kaiser's reach mid-frisk and tried to run away. Dannah's active, physical resistance and potential threat "permit[ted] increasing exercises of force . . . to subdue [him]." *Aaron*, 171 F.4th at 827; *see Moore*, 126 F.4th at 1169. Officers hit and grabbed him only while "attempt[ing] to restrain" him as he flailed and kept his hands out of reach. *Roell v. Hamilton County*, 870 F.3d 471, 482 (6th Cir. 2017). Once Dannah was handcuffed and no longer a threat, the physical force ended.

No caselaw clearly establishes that this amount of force entered the forbidden territory of excessiveness, much less in an "obvious" way. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam). After taking Dannah to the ground, officers tried to control him as he fought against them. One officer applied pressure to prevent him from getting up. Another officer tried to yank his arms or hold his legs. And at least one officer threw punches. The takedown allowed the officers to neutralize a reasonably perceived threat after an interrupted frisk. *See Aaron*, 171 F.4th at 826. The punches and yanking in this instance present no greater physical imposition than a typical tasing, which we have permitted in similar circumstances. *See Bell*, 37 F.4th at 368. Given an unalleviated concern about a weapon and given Dannah's continued physical resistance, the officers' choice to apply physical force until they could handcuff Dannah did not cross any clearly established lines. *See Moore*, 126 F.4th at 1169.

Dannah claims that *LaPlante v. City of Battle Creek* supports his position. 30 F.4th 572, 580 (6th Cir. 2022). But that case did not involve the kind of active, physical resistance the officers encountered here. *LaPlante* denied qualified immunity when an officer performed a takedown maneuver and held the suspect down by laying on top of him. *Id*. at 576 n.8, 580. But that case did not deal with escalating police measures in response to escalating resistance. We instead found "genuine disputes of fact regarding whether [the plaintiff] resisted arrest" in the first place. *Id*. at 580. No such dispute exists here. Dannah started the struggle by wrenching away from Officer Kaiser's reach before the end of the frisk. *See Moore*, 126 F.4th at 1169. Dannah admits that he resisted the frisk, Appellee's Br. 7, 12, and body camera footage confirms that he continued this resistance on the ground. *LaPlante* does not remotely alert the officers that their conduct violated the Fourth Amendment.

The same goes for *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009), the only other case Dannah offers. *Grawey* involved a physical assault on an unconscious suspect. *Id.* Whatever else one can say about Dannah's flailing and yelling throughout the encounter, it did not involve the behavior of an unconscious person.

Dannah insists that the officers' body camera footage, shaky and dark in some spots, permits too many alternative versions of the incident to allow for summary judgment. But the footage establishes the material facts: Dannah bolted from the frisk; the officers performed a

takedown in response to his escape; Dannah continued to resist on the ground; and the officers applied increasing physical force in response to his continued resistance. *See Scott*, 550 U.S. at 380–81. No less importantly, even taking all of Dannah's descriptions of what happened in the shaky and dark moments as true, Dannah fails to point to caselaw categorizing the officers' actions as excessive.

Dannah makes much of the fact that the officers did not find any weapons or drugs on him after his arrest, permitting the inference (he says) that they never should have frisked him in the first instance. But that argument assumes that an opposite inference is possible—that, when officers discover drugs or guns on a suspect, such an after-the-search development supports their actions. That is wrong. *See United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011). Neither inference in fact is true. What matters is whether a reasonable officer in this situation would have had a legitimate reason to conduct this frisk and to take the subsequent actions these officers did to protect their safety.

We reverse.